## THOMAS W. MULFORD, THEODORE B. CUNNINGHAM AND ALVINO C. CAMPBELL v. CHARLES LE FRANC ET ALS.

"ENAGENASION," IN MEXICAN CONVEYANCES, CONSTRUED.—The words "Enagenasion ＊ ＊ del terreno," without any other limiting term, in a conveyance under the Mexican law, indicates an intent on the part of those executing the instrument to convey the fee, and not an intent to create a mere servitude upon the land, as a use or usufruct.

ADVERSE POSSESSION, STATUTE OF LIMITATIONS.—Garcia and Nye, in 1840, while the Mexican law was in force in California, executed before the Alcalde of San Francisco an instrument in writing manifesting upon its face an intent to "alienate" by the former in favor of the latter the land therein described, but without expressing or indicating whether for a consideration or as a donation. Nye immediately entered into possession under said instrument in writing, and he and his grantors, down to and including defendants, have ever since continued in possession claiming title in fee. *Held*, that the possession under said instrument by Nye and his grantees was adverse from the beginning, even conceding the said instrument to be insufficient under the Mexican law to pass title by reason of a failure to express therein a consideration, or to indicate that the conveyance was intended as a donation, as the case might be. *Held, further*, that said possession having been continued by Nye and his grantees, including the defendants, for a period of more than five years since the passage of the Statute of Limitations, and before the commencement of this suit, all right of action in favor of plaintiffs, derived from said Garcia is barred.

ACTS OF PARTIES UNDER CONVEYANCE SHOW THEIR INTENTION IN MAKING IT.— If the meaning of the language of an instrument in writing relating to a transfer of land is doubtful or ambiguous, the Court will consider the surrounding circumstances and call to its aid the acts of the parties done under it as a clue to their intention.

CONSTRUCTION OF LANGUAGE OF A DEED.—If a question of law arises upon the construction of a deed, it is the province of the Supreme Court to construe it and determine from the language used in it what was the intention of the parties to the same.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The facts are stated in the opinion of the Court.

*J. B. Crocket,* for Appellants.

The paper from Garcia to Nye is the foundation of the plaintiffs' claim. If that paper is a valid conveyance of the title, transferring the absolute dominion of the property from the former to the latter, it is conceded the plaintiffs have no case. For the plaintiffs it is claimed that this paper, on its face, purports to be only a lease or license, and not a conveyance in fee; and it is further claimed, that even though it purport to be a conveyance, it is void under the Mexican law, because no price is named. For defendants we insist the paper is, in terms, an absolute conveyance, and that it is not void because no price is named in it. The paper being in a foreign language, its true meaning is to be arrived at only by means of the testimony of experts in that language, and the definitions of the terms employed, as found in approved standard works. Tested by the first method, we may confidently claim that our construction is the proper one. On the face of the paper there is nothing to indicate that it was intended as a lease. No term is specified and no rent reserved, nor is there any stipulation to restore the possession, nor any provision against waste. In short, it lacks every element of a lease. It is equally obvious that it is not simply a license to enter and occupy. Terms are employed which plainly indicate that *some* estate or interest passed. Apt phrases are *not* employed to indicate a license. The concluding sentence empowers Nye to use the property when or as he pleases; and Garcia, in order to obviate any doubt as to his intention, puts over his signature the word " Cedo," " I grant," " I convey," and there is no provision that Nye is at any time to surrender the possession or to hold on sufferance.

But if the instrument is so doubtful that no certain interpretation can be given to it, the doubt must be solved in favor

12

of the grantee. Doubtful phrases are construed most strongly against the grantor, and construing the instrument by this rule, there can be no. doubt that it should be held to be an absolute conveyance.

The argument for the respondents is, that this paper is a lease or license, and that Nye and his vendees having entered under it, they are estopped by it from denying Garcia's title. But if by straining the sense of certain words and phrases in the instrument it can, by any ingenuity, be tortured into a lease or license, no one, I apprehend, will venture to claim that it is clear, precise, and definite in its terms, and free from ambiguity. On the contrary, it is not only extremely vague, but employs words admitting of several significations, which would vary the sense as you attach to these words the one or the other meaning. If this instrument be valid as an estoppel, it would be difficult to conceive of one too obscure to accomplish the same result.

If the paper created a tenancy at will, or on sufferance, or was a mere license to enter, Nye had no assignable interest, and his vendees were disseizors ; and if they entered as purchasers, claiming the fee, and held adversely, the Statute of Limitations commenced to run from the time the landlord had notice of these facts. (4 Kent, 114 ; Taylor's Landlord and Tenant, Sec. 112 ; 14 Pet. 162 ; 1 Greenleaf's Cruise, 266 ; 6 Greenleaf, 12.)

*Patterson, Wallace & Stow,* also for Appellants.

The Statute of Limitations was a bar to plaintiffs' action. (Wood's Dig. p. 46, Sec. 6.)

Nye did not enter as *tenant* of Garcia; he claimed to have a deed of sale from *José Manuel Garcia,* and entered claiming the *title.* He purported to convey the title in fee simple absolute, and his several conveyances were by deed of grant, bargain, and sale. The grantees assumed to and believed they were purchasing the fee. The deeds purport to convey the fee. Nye never paid any rent, nor did any of his grantees. Garcia

never demanded any rent, nor did his widow.   The defendants and their landlords, *Pierce* and *Nichols*, have always claimed to own in fee.

The plaintiffs did not show, nor attempt to show, *any recognition* by the possessors of a tenancy *at any time.*   They claim the tenancy existed only by construction of the instrument, Garcia to Nye, *which Nye and we always claimed to be a conveyance of the fee.*

No proof other than that instrument was given showing or tending to show a tenancy.

It appears from the record that the defendants and their grantors have, since the year 1848, continuously, openly, and notoriously possessed the premises in dispute, holding them adversely, in good faith, under claim and color of title.   *Such holding makes out the defense of the Statute of Limitations.*

That defense could only be overcome by the plaintiffs " by showing that their title was derived from the Mexican Government, and that five years had not elapsed since the final confirmation of that title by the United States.   The defendants under this view of the case alone were entitled to judgment."   (*Richardson* v. *Williamson,* 24 Cal. 289.)

When the persons deraigning title from Nye purchased and took a conveyance, they acquired, or at least believed they did, the property for themselves, and their faith was not pledged to maintain the title of one.   (*Blight's Lessee* v. *Rochester,* 7 Wheaton, 548 ; *Willison* v. *Watkins,* 3 Peter's U. S. S. C. R. p. 48.)   From the date of each of those deeds they claimed to hold adversely, and such claim, accompanied by their continuous possession from 1848 to November, 1861, bars the plaintiffs' action.

*Shafter & Goold,* for Respondents.

The document upon which appellant relies was made under the Mexican law.   By the provisions of that law its force and effect must be determined.   We will strive to establish—1st, That it is no sale ; and, 2d, That whatever contract it might

have been under the system in force here, it was not a contract translative of the title to property; 3d, That it was nothing more than what in our system is equivalent to a tenancy at will.

The operative word in this document is *enagenacion.* Garcia, who owned the premises, and Nye, who was about to receive possession of them, went before Guerrero, the Alcalde, in reference to an *enagenacion.* They went for nothing else. If we can find out what *enagenacion* means we will know the object of their visit so as to·tell it in the English language; and knowing that the task of deciding this case is easy, what is the meaning in the Spanish language of the verb ENAGENAR?

Escriche's Dictionary of Legislation and Jurisprudence is a work of approved authority. That author gives an excellent definition of the word in controversy.

*Enagenacion,* he tells·us, signifies no less than nine different things. It means: 1. A sale; 2. A donation; 3. A mortgage; 4. An exchange or barter; 5. A lease for rent money; 6. A·pledge; A servitude, which is divided into: 7. A use; 8. A usufruct; 9. Habitation.

Here are no less than nine different contracts, either one of which may be meant by the word! Therefore it is the duty of the appellant who relies upon it to explain which of these contracts it is that is embodied in the instrument in question. It must be one of them. Which is it?

1. *The instrument is not a sale.*

In the Mexican system, as in that in which it has its origin, there are three things essential in every contract of sale. Indeed, three, in the absence of any one of which, there can be no such thing as à sale. They are: 1. A price in money; 2. A thing sold; 3. Consent of the parties.

When, therefore, an instrument is presented as embodying a contract of sale, if it be discovered in looking over it, that there is wanting an expression of the consent of the parties, or·a description of the thing sold, or the naming of a price agreed on, the paper, no matter whatever else it may be called, is at once pronounced no sale. This rule is fundamental. In

its application, it has always been held inexorable. There never has been a deviation from or relaxation of it in any instance whatever.

A price is one of the legal requisites of the contract of sale. (*Gorham* v. *Hayden*, 6 Rob. 450 ; *Conway* v. *Bordier*, 6 Lou. 346.)

2. *The instrument is not a donation.*

A document, said to be a donation under the system we are considering, was obliged to contain certain features not found in this one.

" A donation is void when one makes it of all his property, although it be of his present property, according to the law 69th of Toro, because he has not retained for himself the means of subsistence during his life." (Escriche, Donacion Entre Vivos, 650.)

And in order to carry out this public policy the donor was reminded of his obligation to refrain from stripping himself of all his possessions, and so become a burden to the State. He was compelled to declare in the act of donation that he had no need of the property for himself, and that he had enough, otherwise, for his decent maintenance.

The document in question has none of the features of a donation. There is no renunciation to the heirs or successors of Nye. There is no mention of any value, so that it might be determined whether or not the approbation of the Judge should be obtained. There is no clause touching the surrender in favor of Nye of the title papers to Garcia, and no declaration.

3. *The instrument is not a mortgage.*

It is obvious that the purpose of such a contract is the security of a debt, present, or to be created. As between Nye and Garcia there was no debt to be secured.

4. *The instrument is not an exchange or barter.*

The very idea of a contract of barter suggests the parting with property on both sides. Nye surrendered nothing—gave nothing.

The instrument is not a lease for rent money, nor is it a pledge.

There remains but one of the agreements known to the Mexican system, and which is comprehended within the term *enagenacion,* and that is *an agreement for the use of the property in question.*

A contract, then, for the use of a lot of ground is a contract known to the law. And thus we have an explanation of the sort of *enagenacion* that took place when Nye and Garcia went to the Alcalde's office.

They went to place in the archives some written memorial of their understanding that one should confer upon the other the right to use this lot. The use, says the law, is to be enjoyed according to the party's necessities. *Segun sus necessidades.*

Nye was empowered to make use of the lot whenever it should be convenient for him to do so; *i. e.,* whenever his necessities should require. If Garcia had thought he was conveying to Nye the lot in full ownership, it would not have occurred to him to add any words conferring upon Nye the right to use the property—for that, of necessity, would have followed.

It will be remarked that the only purpose mentioned in the paper is that of bestowing upon Nye the *uso,* the use of the lot. Enabling him to make use of it was all they seemed to have had in contemplation: they succeeded; the document was recorded, and their purpose, as we have abundantly shown, was just what they called it—an *enagenacion*; for it would have been impossible to make an agreement for the *use* of real property without making an *enagenacion* of it. This being the nature of the agreement, we have only to inquire how long the right acquired by it was to endure. At a glance, we see that no time was mentioned. Therefore its duration must have depended upon the will of Garcia, the owner of the premises. And this brings us to the definition of the agreement told in the English language, to wit: *a tenancy at will.*

*John B. Felton,* for Appellants in reply.

With all deference to the learned counsel, we submit that all through their argument they have confounded the real question in this case, which is: "To what extent did Garcia intend to alienate this lot to Nye, whether in fee, or by way of lease, or by way of use?" with another question of no importance to the case, which is: *What was the consideration which induced the alienation?*

It is evident that on the question of extent of alienation, the price or motive which induced the alienation has no bearing.

Thus, counsel say: 1st. This instrument has no price contained in it: therefore it is not a sale. 2d. It does not state that the land was alienated for something else than money: therefore it was not an exchange. 3d. It does not contain words indicating the intention to make a present: therefore it was not a donation.

That is, counsel say in substance: "*Garcia did not intend to alienate this land in fee to Nye,* because in the instrument Garcia did not name a price or a consideration, or say that it was without a consideration."

Now, we submit that all this matter of price, or want of price, has nothing to do with the real question in this case, which is, "*To what extent did Garcia, whether gratuitously or not, intend to alienate the land?*"

Now, we deny that an instrument under the Mexican law, in order to be a good conveyance, must contain the price or the consideration on which it was made. If the intention to make an absolute conveyance is apparent on its face, then that intention will be carried into effect.

The absence of a price in the instrument does not show that it was not a sale or a barter. The absence of words indicating a benevolent intention does not show that it was not a donation. But *the presence of words showing an intention to convey in fee simple does demonstrate that the contract is either a sale, or a barter, or a donation, it is immaterial which, since all of these contracts are valid.*

Counsel seem to find something in the expression in this

instrument, "por lo que dicho Capitan hace uso quando se convenga," " Wherefore said Captain makes use whenever he may see fit," indicative of an intention to create a use only.

But this expression, " hace uso," is exactly equivalent to the English phrase, "to his use and behoof." It is found in almost all Spanish conveyances.

" Enagenacion—The act by which the property in a thing by lucrative title is transferred as a donation, or by onerous title, as by sale or barter.

" This word, taken in a more extended sense, *comprises*, also, the lease, the pledge, the mortgage, *and even* the creation of a servitude on an estate. It follows herefrom that a person who cannot alienate a thing can neither pledge, hypothecate, nor incumber with servitudes. The person who is disabled from alienating a thing, says the law, can neither sell, nor barter, nor hypothecate the same, nor create any servitude thereon, nor have the same assessed to any persons who are disabled from alienating the same."

Now this definition. does not say nor imply that the word *alienation*, by itself, ever means a lease, or a mortgage, or a pledge. It only says that, taken in a sense wider than its ordinary sense, it *embraces* or *comprehends* all these smaller interests ; so that a person who by law is disabled from alienating his property, is disabled also from alienating any interest therein.

In other words, the word *alienation* is a broad word of transfer, embracing all transfers, qualified or absolute, by which property can be affected.

The same is true of the English word *alienation ;* though the word used without restriction means the complete and full transfer of the thing alienated, yet, in a broader sense, it embraces all the modes by which property is transferred for a. time, or to an extent less than the entire ownership.

By the Court, SAWYER, J.

This is an action to recover the hundred vara lot fronting on Washington, Montgomery and Jackson streets, in San Francisco.   It was tried by the Court without a jury, and the following are substantially the facts as found by the Court:

On the 30th day of August, 1840, one José Manuel Garcia was seized in fee of the said lands, by virtue of a grant previously made by authority of the Mexican Government.   The whole lot, except a small strip along Montgomery street, was then below the line of ordinary high tide.   Said Garcia, on that day, made with one Gorham H. Nye an instrument in writing, touching the same, in the form, words, and figures following, viz:

"SAN FRANC°, Agost 30, 1840.

"En virtud de habero presentado en este jusgado de mi car-, go Don José Manuel Garcia y el Capitan D. Geronimo H. Nye, Mejicano natur$^{do}$ sobre la enagenasion que hace el prim° al segundo del terreno que este concedio de cein varas cuadrades al E. de la laguna entre el mar y la plaza del punto de Yerba Buena, por lo que dh° Cap$^n$ hace uso cuando se convenga.

"Sedo :                                    F. GUERRERO.
"JOSE MANUEL GARCIA.                        G. H. NYE."

[Translated thus :]

"SAN FRANCISCO, August 30, 1840.

"Whereas, Mr. José Manuel Garcia and Gorham H. Nye, a Mexican by naturalization, have appeared before this tribunal under my charge in reference to the alienation which the former makes to the latter of the land which this [functionary] granted of one hundred varas square at the east of the laguna between the sea and the beach, at the point of Yerba Buena, by which the said Captain makes use when it may be convenient.

"I yield :                                 F. GUERRERO.
"JOSE MANUEL GARCIA.                        G. H. NYE."

Under this instrument, Nye entered into possession of said

lands, used and occupied the same, and in the year 1848 conveyed the south half to one E. P. Jones; a portion of the north half to W. C. Parker, and the remainder to W. C. Parker and G. McDougall; and the said several grantees went into possession under their respective deeds, of the portions so conveyed. Prior to the 10th of September, 1853, these several grantees conveyed the said lands to certain of these defendants, named in the finding, who went into possession; and they and their tenants continued in possession from that time till the commencement of this suit.

On said 10th day of September, 1853, Abel Guy and others—a portion of said defendants—and the grantors of the others, prosecuted a suit in the Superior Court of the City of San Francisco, against the Commissioners appointed under the Act of 1853 to provide for the sale of the interest of the State within the water line front of the City of San Francisco, wherein said Guy and others claimed title in fee to said one hundred vara lot, through and under said Garcia, and denied any title in the State of California. In said suit a final decree was rendered perpetually restraining said Commissioners, their successors, etc., from selling said lands, which decree is still in force. Afterwards, the successors of said Commissioners, notwithstanding said decree, did sell the State's interest in said land, and said defendants, by mesne conveyances, have acquired the interest so sold.

Said Garcia died in November, 1846, leaving surviving Estefana Feliz de Garcia, his wife and only lawful heir at law. After Garcia's death, the said Estefana married Antonio M. Villa, and on the 10th of November, 1856, by a deed executed by herself and said Villa, her husband, conveyed all her right, title, and interest in said lands to Manuel Castro, who, afterwards, in 1861, and before the commencement of this suit, conveyed to plaintiffs. Plaintiffs immediately afterwards, on the 22d of November, 1861, notified defendants of their acquisition of title from the heir of José Manuel Garcia, deceased, and required said defendants to remove from the premises on or before the 30th of November, 1861. Said defendants did

not remove from said lands, nor have they or any of their grantors from whom they obtained possession, including said Nye, ever surrendered to said Garcia, or his successors in interest, said land or any part thereof.

The Court then finds, as a conclusion of law, that by the aforesaid instrument in writing, between said Garcia and Nye, dated the 30th day of August, 1840, and the entry into possession thereunder by said Nye, the relation of landlord and tenant was created between them, and that said Nye then and there became tenant at will of the said Garcia; that on said Garcia's death, his wife, Estefana, succeeded to his estate as sole heir at law, and became vested with the fee of the land; that the relation of landlord and tenant so existing between the said Garcia and Nye attached to all who succeeded to the estate of Garcia, including plaintiffs; that said defendants were tenants, or *quasi* tenants of the plaintiffs until December 30, 1861—until which time the Statute of Limitations did not commence to run against said plaintiffs, and that plaintiffs were entitled to recover. Judgment was entered accordingly. A motion for new trial was made and denied, and defendants appeal from the order denying a new trial, and from the judgment.

Numerous questions of more or less gravity are made by the appellants on the motion for new trial; but the great question in the case, upon which the entire merits of the controversy hinge, arises upon the construction of the instrument executed between Garcia and Nye; and this question has been argued with great ingenuity and ability by the counsel on both sides.

On the part of the appellants it is contended, that this instrument was intended by the parties to be a conveyance of the fee from Garcia to Nye; while the respondents deny this proposition, and insist that it was only intended as a license or permission granted to Nye by Garcia to use the premises during the pleasure of Garcia, and that the position of Nye was something analagous to a tenant at will at common law. The latter construction was adopted by the learned Judge who tried the case, and it is the only theory upon which this action

can be maintained. If, therefore, the Court erred in its construction of this instrument, the judgment must be reversed on this ground, and it will be unnecessary to examine the other questions discussed in the briefs of counsel.

The main difficulty in arriving at the intention of the parties arises from the fact, that the laws under which the instrument is to be construed, and the instrument itself, are written in a foreign language, and it is not easy to translate from one language into another in such a manner as to convey to one familiar with the latter only, precisely the same idea that it conveyed to the original parties, one of whom at least, was probably familiar with the language only in which the instrument and the laws by which it is to be interpreted, were written. Different translators, equally competent, will use different language, and give a different gloss, or shade to the meaning in transferring the idea intended to be conveyed from one language to another, as is done in this case. There are three translations of the instrument in the record, made by parties well known to be competent Spanish and English scholars, and testified to by them as being correct, yet each differing from the other in some particulars, and these all differing from the one adopted by the learned Judge who tried the case. But, as the latter is the most favorable one for the respondents, we shall regard it, for the purposes of this discussion, as being in the main correct. Notwithstanding the different habits of thought, and we may say, the different ideas of those using different languages, and the almost impossibility of transferring the precise idea from one language to another by words even apparently of equivalent import, we think, upon general principles of construction common to all languages, there will be little difficulty in arriving at the intent of the parties to this instrument; and if we can ascertain the intent of the parties themselves, it does not matter—so far as the decision of this case is concerned—whether they succeeded in making an instrument sufficient in law to effectuate that intent or not. If the parties intended by this instrument to convey the fee, and that intent is manifest from the language of the instrument, even though the

instrument be void for want of pursuing the forms prescribed by law, or for a failure to enumerate all of the essential elements of a valid deed of conveyance under the Mexican law, the consequence will be the same to the respondents.  For if Garcia intended to convey, and Nye intended to purchase, and the instrument was executed, and Nye entered under it with that understanding, claiming the fee, his holding was adverse from the beginning.  There was in such case no entry in subordination to title in Garcia—no acknowledgment by Nye of Garcia's title, and whether the instrument was sufficient to pass the title or any interest whatever or not, the entry and subsequent occupation were adverse, and the relation contended for by the respondents never existed.  In that event the right of action, if any ever existed in the respondents and their grantors, is barred by the Statute of Limitations, which commenced to run, at least, as early as the date of the conveyance to Castro, in 1856 ; for there is nothing in the record, either in the pleadings, the facts found by the Court, or the evidence, which brings the case within the exceptions of the proviso of the sixth section of the Act.  If, then, we find upon a fair construction of the instrument that Garcia intended to convey the land to Nye, it will be unnecessary to inquire whether or not the instrument was sufficient under the law in force at the time to transfer the title.

The very ingenious and able argument of the respondents' counsel is mainly addressed to the elucidation of the meaning of the word, " enagenasion," as the one upon which the case is to turn.  It is claimed that this word signifies no less than nine different things: 1, a sale; 2, a donation; 3, a mortgage; 4, an exchange or barter; 5, a lease for rent money; 6, a pledge; and a servitude, which is divided into: 7, a use; 8, a usufruct; 9, habitation.  It is argued that, under the Mexican system under which this contract was made, three things are essential to constitute a contract of sale :   1.  A price in money; 2. a thing sold; 3. Consent of parties; and that, in the absence of any one of these elements, there is no sale; and, as no price is named in the instrument under consideration, that it cannot

be a contract of sale.   Concede, for the purpose of argument
(in regard to which, however, the decisions, or rather the dicta,
in this State do not appear to be uniform), that a price must
be specified in the instrument evidencing the contract in order
to render the contract valid, still this does not seem to afford
any aid in the solution of the question, What was the intent
of the parties ?   It seems to go only to the question of the
validity of the contract, rather than to indicate the intent of
the parties.   Under our Statute of Frauds, certain contracts are
not only required to be in writing, but the consideration is
required to be expressed.   Such contracts are sometimes held
to be void because no consideration has been expressed, but
we are not aware, that the absence of an expression of the
consideration has been looked upon as evidence that the
parties did not intend to make the contract expressed in the
instrument.   It may be evidence of ignorance or carelessness,
but not of a want of intent to make the contract indicated by
the language used.   And no authority from the Mexican law
is produced to show, that the omission to specify the price
tends to show that a party did not intend to convey, if the in-
strument in other respects manifested such intention.   By the
same mode of reasoning as that applied to the contract of sale,
the respondents endeavor to show that the instrument under
consideration cannot be any one of the first six contracts em-
braced in the definition of the word " enagenacion."   It is not
even claimed to be the fifth, " a lease for rent money," for the
argument which proves it not to be a " sale," equally demon-
strates it not to be a " lease."   It is therefore said to be one
of the servitudes, and as it cannot be a " habitation," it must
be either " a use," or " a usufruct."   And on the hypothesis
that it is one of these two the case is rested.

"A use," as defined by Escriche—and in this opinion we
adopt the translations furnished by the respondents—is, " The
right which a person has to use or enjoy the property of an-
other according to his necessities.   It is one of the three per-
sonal servitudes, which are, use, usufruct, and habitation.   It
is established by contract, by last will, and by prescription,

etc."   " Usufruct—the right to use and enjoy the property of others; that is, to appropriate its fruits without impairing the substance."   We accept these definitions of a sale, a use, and a usufruct; but the question still remains, which of these contracts, or of the six others enunciated, was intended to be expressed by the word, " enagenasion," or the word " enagenacion "—as it is conceded by all parties the word should be spelled—in connection with the other language of the instrument under consideration?   According to Escriche—and we again adopt the translation furnished by the respondents— " enagenacion " means, " The act by which the property in a thing, by lucrative title, is transferred, as a donation ; or by onerous title, as by sale or barter."

" This word, taken in a more extended sense, comprises also the enfiteusis (lease), the pledge, the mortgage, and even the creation of a servidumbre (servitude), on an estate.   It follows, herefrom, that a person who cannot alienate (enagenar) a thing, can neither pledge, hypothecate nor incumber the same with servitudes (servidumbres)."

Now, what is the plain sense of this definition of the word " enagenacion? "   Obviously, that in its ordinary use it means a transfer of the title, the fee, but taken . in a more comprehensive and enlarged sense, it may mean something more than is usually understood by it, and include the six other contracts mentioned.   The word, as used in the instrument under consideration, has been rendered in all the translations in the record by the English word, " alienation," and it is manifest from the definition given by Escriche in its most comprehensive sense, that the meaning of the two words, " enagenacion," and, " alienation," are as nearly identical as the signification of any two words in different languages are ordinarily found to be.   Blackstone, Book 2, p. 287, says : " The most usual and universal method of acquiring title to real estate is that of alienation, conveyance or purchase in its limited sense; under which may be comprised any method wherein estates are voluntarily resigned by one man and accepted by another, whether that be effected by sale, gift, marriage settlement,

devise or other transmission of property by the mutual con-
sent of the parties;" and (ib. p. 103), he says: "An estate
in lands, tenements and hereditaments signifies such interest
as the tenant has therein." And on the same page, estates are
divided "into such as are freehold, and such as are less than
freehold," and, "estates of freehold are estates of inheritance,
or estates not of inheritance"—the various estates of freehold
being enumerated (ib. 104, *et seq.*); and "of estates less than
freehold there are three sorts: 1. Estates for years; 2. Estates
at will; 3. Estates by sufferance."

Thus it will be seen that the word, "alienation," in English,
like the word, "enagenacion," in Spanish, embraces in its most
comprehensive sense the transfer of every estate known to the
law, from a fee simple to an estate at will or sufferance.

But, says the respondents' counsel, "No man who speaks in
English, and means, for example, to convey the idea that his
friend Smith has leased his fifty-vara lot to Jones, would say
Smith had alienated the lot to Jones. Until the idea of part-
ing with the ownership had occurred to the speaker, he would
not think of the word alienation. We never speak of aliening
our possessions without affixing to the expression the thought
of a change of ownership of the property itself. We write
'grant,' 'bargain,' 'sell,' 'alien,' and 'convey,' but we never
write those words when we make a lease. The word aliena-
tion with us is not used to picture the creation of an inferior
estate. It comes in vogue only when summoned to serve the
purpose of the higher estate—the fee simple absolute—the
estate of inheritance." This is very forcibly expressed, and we
therefore adopt the language. For the same reason, so far as
we are able to discover, the Mexican did not use the word,
"*enagenacion*," in connection with the word, "*terreno*" with-
out any limiting or qualifying term to convey the idea that he
had granted a leasehold interest, or a mere "use," or "usu-
fruct" on the land, and not the land itself.

According to the translation adopted by the Judge below,
and which is substantially sustained by all the other transla-
tions in the record, the parties appeared before Guerrero "in

reference to the alienation (enagenacion) which the former makes to the latter of the land"—not of a use or usufruct in or upon the land, but "of the land" itself.   It seems to us that it would be just as absurd to suppose that a Mexican would use the word, "enagenacion," followed by a word signifying land, without any qualifying term, to express the idea that he had created "a use," or "usufruct" on the land, either for a limited or an indefinite period of time, as for an Englishman to say, he had alienated the land, when he intended to convey the idea that he had created a tenancy at will, only, in the land.   But suppose we are wrong in this, and that in the Spanish language "enagenacion" may mean more than "alienation" in English, and that it is admissible to use the phrase "enagenacion del terreno" to convey the idea that a party had only created a servitude—a mere use "on an estate" in the land; still, it is also, and much more frequently used to express the idea, that the title to the land itself—the fee— has been conveyed, and it is only necessary to ascertain in which sense the phrase was intended to be used by the parties.   If we were called upon to construe a word which had no limiting or qualifying term, the rule of construction at common law would be, to give it its ordinary signification—the sense in which it is generally and by-far the most frequently used; and as this rule is based upon common sense, we have no reason to suppose the rule was otherwise under the Mexican law.   What is the obvious ordinary signification of "enagenacion" in the Mexican law?   Clearly, if Escriche is to be relied on, "The act by which the property in a thing, by lucrative title, is transferred, as a donation; or by onerous title, as by sale or barter."   In Seoane's Neuman & Baretti's Dictionary, by Velazquez, the word "enagenar" is defined as follows: "To alienate, to transfer or to give away property;" and the word, "enagenacion:" "Alienation, the act of transferring property;" and these are the only definitions of those words relating to property given in this dictionary.   Unquestionably the word is ordinarily and generally used to express the idea of a transfer of title, either as a gift; for a money

consideration; or by way of barter; at all events a transfer of the fee, and not a base or qualified estate; but the word itself does not determine whether as a gift; for a price; or by way of barter. If either of these ideas is to be added, other words must be used.

True, Escriche, after giving this principal definition, adds substantially that it may be used in a more comprehensive sense. " This word, taken in a more extended *sense*," says he, "comprises also the *enfiteusis* (lease,) the pledge, the mortgage, and," he adds, as though it lay on the very outermost borders of the territory of this far-reaching term, "even the creation of a *servidumbre* (servitude) *on an estate.*" Now, in which of these senses, in the nature of things, must the term be ordinarily used and uniformly understood, unless there is some other term used to qualify it? Obviously in the sense of a transfer of the title. The alienation of the land, the transfer of the fee, was a common everyday transaction on this continent, whether in Anglo-American countries, or in California, or probably in other Spanish-American countries. It is undoubtedly, in this age and in these countries, the most frequent of all transactions in relation to lands. But the creation of a servitude on an estate, and for an indefinite period of time, must necessarily be a comparatively rare transaction, so rare that it is hardly conceivable that parties intending to create such an estate would use the term which ordinarily signifies, and which unlearned persons would naturally understand to signify an absolute transfer of title, without the use of some other term clearly limiting the meaning to the particular inferior estate intended to be created. In the nature of things the occasion to use the word "enagenacion" to express the creation of a use "on an estate" in lands must have been seldom—so seldom, that, when so extraordinary an occasion occurred, the necessity of qualifying it by some words expressing the exact interest intended to be transferred, in order to guard against misapprehension, would almost inevitably have suggested itself. But when used in its ordinary signification—the transfer of the fee—as everybody would naturally understand it in that sense,

no such necessity would exist. Nor does the fact that the parties through ignorance, inadvertence, or even design, have omitted to state whether the transfer was made for a consideration in money, or by way of barter, or was intended as a gift, militate against this construction. If it were intended to create a use simply, the parties, whether required by some rule of law to do so or not, would be just as likely, as in the case of a sale, to state whether it was for a consideration, or intended as a gift. In our judgment the expression or omission to express the consideration or motive of the transfer, does not aid or obstruct the mind in its efforts to solve the question of the intent of the parties.

It is argued by the respondents' counsel that the closing words of the instrument translated in the finding, " by which the said Captain makes use when it may be convenient;" also by one of the witnesses, " wherefore said Captain makes use when he sees fit;" and by another, " wherefore said Captain makes use of it whenever it may suit him;" indicate a purpose of bestowing upon Nye only the use of the lot, and that these words thus limit and qualify the meaning of the word " enagenacion," already discussed. It is insisted, that, if Garcia had thought he was conveying to Nye the full ownership, it would not have occurred to him to add any words conferring upon Nye the right to use the property, for that, of necessity, would follow. But these, or similar words are found in many Mexican grants, both from the Government and from individuals. They seem to be merely formal words, like the words, " to his use and behoof," in the ordinary conveyance in the United States. Thus, the original grant of this very lot from Alcalde Guerrero to Garcia concludes with words of similar import— " making use afterwards of said lot." So also the original grant of Sanchez to Guerrero in the record in this suit contains a similar formal phrase : " In order that he may possess the same legally and pacifically and make the use that suits him." The phrase, then, is undoubtedly a mere formal one, common in Mexican conveyances and not intended as a limitation of the meaning of the language previously used.

The word, "sedo," or "cedo,"—as it is conceded by both appellants and respondents the word should be spelled—to which the signature of Garcia is appended, should manifestly be translated, "I grant." It is the ordinary word used in Mexican conveyances to pass title to lands. The witnesses all translate it, "I grant," and the same word in composition, "consedo," in the same instrument, is rendered by the word, "granted," in the translation adopted in the finding. But whether translated, "I yield," or, "I grant," in the connection in which it stands, it must be regarded as expressing the assent of Garcia to the transfer of the land. This instrument was drawn up by the Alcalde, and expresses the object for which the parties came before the officer—that is, "in reference to the alienation which the former (Garcia) makes to the latter (Nye) of the lands," etc.—and when it is drawn out Garcia expresses his assent by writing his name at the bottom, after the word "sedo," "I grant," or, "I yield," "I resign," "I deliver up," "make over." We are satisfied from a careful examination of the instrument by the light of the able argument of the counsel on both sides, that the parties intended to transfer the fee. Whether the instrument was sufficient in law to effectuate that intention, as we have before remarked, it is not necessary to decide.

But if the meaning of the language of the instrument can be considered doubtful, "Another rule of construction is, that when the words of a grant are ambiguous the Court will call in the aid of the acts done under it as a clue to the intention of the parties. Upon this principle we are permitted also to look at the undisturbed use of the right contested on the one side and the unqualified acquiescence on the other, down to the time of the plaintiff's purchase of the premises in 1857." (*French* v. *Cathcart*, 1 Comst. 102.) In this case, down to the time of the notice to quit, given by plaintiff, December 2, 1861, more than twenty-one years after the execution of the instrument and entry under it.

"In the construction of grants the Court ought to take into consideration the circumstances attendant upon the transac-

tion, the particular situation of the parties, the state of the country and the state of the thing granted, for the purpose of ascertaining the intention of the parties." (*United States* v. *Appleton*, 1 Sum. 502.) Apply these rules to the construction of the instrument under consideration, and every shadow of doubt as to the intent of the parties, if any there be, must be at once dispelled. The instrument was executed in 1840— twenty-four years ago. Lots of this kind could then be had almost for the asking. But a small strip of it was above the line of ordinary high tide. It is hardly to be supposed that a party would put improvements upon land thus situated and in as little demand as such lands were at that time, when he only expected to occupy at the will of another. Still less probable is it, that, at a time when conveyances, even of the fee, were made with great carelessness parties would take the trouble to go before the Alcalde and make a formal contract for one to occupy land gratuitously at the will of the other. What object could there be in such formal proceedings, since the grantee could be turned out on the next day at the will of the grantor, and the grantee's condition could be no worse without such formality? But Garcia lived till 1846, six years afterwards, and, so far as anything to the contrary appears, acquisced in the enjoyment of the estate by Nye. He left a widow, who is claimed to be his sole heir. If her husband owned the lot, and Nye was supposed to have only a use in it, terminable at the will of Garcia, it is highly probable she must have known it. As early at least as 1848 the property began to be valuable, and Nye, claiming to be the owner in fee, sold and transferred it to various parties, by deeds purporting to convey his title. His grantees immediately occupied and improved it, and they and their grantees have openly occupied it, claiming to own the fee down to the present time. Garcia's widow, who is claimed to be his sole heir, does not appear to have set up any claim to the land down to 1856—ten years after the death of her husband—at which time she conveyed her interest to one Manuel Castro for the paltry consideration, compared with the value of the land, of one hundred and fifty

dollars. Yet from 1850 to 1856, the date of her conveyance to Castro, the ground rent alone must have been worth a thousand if not several thousand dollars, per month. Ross testified that he received from sales of portions of the lot held by him over one hundred thousand dollars, nearly all of which sales were made prior to 1850. It is inconceivable that Garcia and his wife should have acquiesced so long, under such circumstances, in the occupation of the defendants and their grantors, openly claiming to own the land, if they had not supposed the land had been conveyed in fee.

So long acquiescence under the circumstances of the case, upon the hypothesis that the parties only intended to convey a use to Nye, to be enjoyed without consideration, at the will of Garcia, is utterly irreconcilable with the ordinary known principles that govern human action.

In the meantime the occupants maintained an action against the State on this instrument, which seems to have then passed unchallenged, as a grant in fee. Castro subsequently, in 1861, conveyed to the plaintiffs, who, for the first time, so far as anything to the contrary appears in the record, set up their claim ás against defendants by giving them notice to quit on the 22d of November of that year.

In the language of Mr. Justice Story, " If there had been any doubt upon the conveyance, which we think there is not, the subsequent usage would, in our judgment, be conclusive as to the construction put upon the conveyance by all the parties in interest." (1 Sum. 503.) In view of the language of the instrument and all the circumstances that surround the case, to hold that the parties, Garcia and Nye, did not intend a transfer of the fee, would be, in our judgment, to violate the well settled rules of construction, and to run counter to all the intrinsic probabilities arising out of the transaction, and the subsequent acts of the parties as presented in the record. If these views are correct, the learned Judge who tried the case gave a wrong construction to the instrument under consideration, and the conclusion of law drawn by him from the facts found was erroneous.

It follows that the judgment must be reversed and the Court below directed upon the facts found to enter judgment for the defendants.   And it is so ordered.

By the Court, SAWYER, J., on petition for rehearing.

After a careful reconsideration of our former opinion, with the aid of the elaborate argument in the petition for rehearing, we are fully satisfied with the conclusions before attained. We are satisfied that the instrument upon which the controversy arises did not create a use, or any other inferior estate in the land.   If a valid instrument, it transferred the fee. That Garcia intended to alienate the land—to transfer the fee—we have no doubt.   And this intention is manifest from the instrument in the record.   But whether the transfer was for a money consideration, by way of barter or exchange, or as a donation, neither the instrument nor the record afford the means for determining.   Nor do we deem it necessary to the decision that we should determine that question.   Nye went into possession under the instrument, and he and his grantees have held under it, claiming title ever since.   This makes their possession adverse.   And such adverse possession was held for more than five years after the Statute of Limitations was in force, and before the commencement of this suit. The bar arises under the statute, and not under the Mexican law relating to prescription.

Only one point more in the petition for rehearing requires notice.   It is said that this Court assumed the functions of the District Court, and found a fact in determining the intent with which the instrument between Garcia and Nye was executed.   The Court below found as a fact that the instrument was executed, and that Nye entered into possession under it. The very purpose of construing an instrument is to ascertain the intent of the parties—the object to be accomplished by it. " When it is necessary to give an opinion upon the doubtful words of a deed, the first thing we ought to inquire into is, What was the intention of the parties?"   (*Brannan* v. *Mesick*,

Opinion of the Court on Petition for Rehearing.

10 Cal. 105 ; Willey, 322.) The real question in this case was whether this instrument manifested an intent to convey the land, or only to create a use—an easement or servitude on the land. It was clearly within the province of this Court to construe the language of the instrument and from its language determine that question. And this is precisely what we did. Nor did the Court go outside of the instrument to ascertain the intent. It did, however, after an examination and determination of the meaning of the instrument from its language, for the purpose of verifying and confirming its own conclusions, consider the acts of the parties, and the circumstances surrounding them, at the time of its execution, and subsequent thereto, and from those acts and circumstances concluded that the parties put the same construction upon it as that adopted by the Court. But were the meaning doubtful, it is well settled that such acts of the parties may be looked at to aid the construction, as is shown by the authorities cited, and many others might be cited to the same effect.

Rehearing denied.

Mr. Justice SHAFTER, having been of counsel, did not participate in the decision of this case.

Mr. Justice RHODES expressed no opinion.