[Sac. No. 5475. In Bank. Aug. 27, 1943.]

LEE ALEX MacNICOL, Appellant, v. EAST COALINGA OIL FIELDS CORPORATION (a Corporation), Respondent.

L. A. MacNicol in pro. per. for Appellant.

C. Ray Robinson and W. Eugene Craven for Respondent.

SHENK, J.—This is an appeal from a judgment in favor of the defendant in an action to quiet title and for declaratory relief.

The case was presented to the trial court on an agreed statement of facts supplemented by documentary and oral evidence introduced during the course of the trial. There is no dispute as to the facts.

In 1919 George Schwinn and Mattie Kearns owned an irregular quarter section of land containing approximately 183 acres located in Fresno County. The land is about twelve miles from the town of Coalinga. Its surface is barren and unimproved, with no roads or streets surrounding it. The only substantial value of the land is in its oil and gas potentialities. The owners commenced preparations looking to its development for oil prospect and production. A subdivision map was filed showing the tract divided into twenty blocks of one hundred twenty lots, each lot being twenty-five feet in width. The map shows 2,160 single lots of 2,500 square feet and 240 double lots of 5,000 square feet each, an equivalent of a total of 2,640 single lots. The lots are shown on the map as fronting on eleven county roads forty feet in width, running east and west, and three roads running north and south. On the map 151.5151 acres are contained within the blocks, and 31.94 acres within the roads. No offer of dedication of the roads as public highways appears on the map, but the county board of supervisors caused to be endorsed thereon an acceptance of an assumed dedication arising from the filing of the map. No such roads were ever constructed.

The defendant, East Coalinga Oil Fields Corporation, was organized to facilitate the furtherance of the project. The corporation was first authorized to act as sales agent for the sale of the lots. Subsequently, title to the tract was conveyed to the corporation. On the theory that the interests to be sold were securities, a permit was obtained from the Commissioner of Corporations which required that seventy per cent of the purchase price of $110 for single lots and $220 for double lots be paid to the owners, and thirty per cent be paid into a fund to insure drilling operations within the tract.

The defendant entered upon the campaign for the sale of the lots. Each purchaser executed a drilling contract with the defendant which described the land to be purchased by lot and block, and provided that the 183 acre tract of land "is believed to be oil bearing and not otherwise productive, and the subdivision is made for mining purposes only. It is further understood that the grantee is an independent purchaser of a parcel of land in fee simple, having as an incident thereto a right to receive a portion of the net proceeds from the sale of any oil produced from any wells drilled upon said tract, by the East Coalinga Oil Fields Corporation, its successors or assigns." The contract also provided that upon the payment in full of the purchase price the corporation would execute a deed to the purchaser which should provide that the grantee "shall receive a proportionate share of eighty per cent (80%) of all the net profits arising from the sale of oil derived from any oil well or wells which the East Coalinga Oil Fields Corporation may drill on any part of the above quarter section, and in the proportion that the number of lots conveyed by said deed bears to the total number of lots in said quarter section subdivision, and the East Coalinga Oil Fields Corporation shall retain twenty per cent (20%) of the said net profits, as its share and proportion of the net production of said well or wells, which is hereby reserved, together with the exclusive right to drill for oil on said quarter section." It was also provided in the drilling contract that the lots containing 5,000 square feet should be computed as double lots both as to price and participation of profits. Upon payment of the purchase price each purchaser received a grant deed executed by the corporation. The deed described the real property conveyed by lot and block number with special reference to the recorded map. The deed reserved "unto said East Coalinga Oil Fields Corporation, for a period of fifty years from the date hereof, the exclusive right to drill for oil upon said described quarter section." By the deed the purchaser was also granted the right to "a proportionate share of eighty per cent (80%) of all of the net profits derived from the sale of oil from any oil well or wells which the undersigned, the Corporation, drills on any part or parts of said subdivision, of which the within described property is a portion, in the proportion that the number of lots conveyed by this deed bears to the total number of lots in said entire tract, as specified in that certain drilling

contract executed by the parties hereto concerning the within particularly described property.''

By such a deed, dated February 1, 1922, J. P. Cackler became the owner of lots 58 and 59 in Block 4. He executed the drilling contract with the corporation. The plaintiff, Lee Alex MacNicol, is his successor in interest as to those lots.

In April, 1921, the defendant commenced the drilling of an oil well in the tract. Drilling continued to a depth of about 4,780 feet, when, in May, 1923, the drilling fund became exhausted, the equipment was lost by foreclosure, and operations were abandoned. In 1938 oil was discovered in paying quantities in the general vicinity of the tract, and efforts to finance drilling operations were resumed. In July of that year numerous owners, including the plaintiff, as lessors, entered into counterpart leases constituting a community oil and gas lease with Zeb A. Terry as lessee, whereby the latter was authorized to drill for and produce oil, gas, and other hydro-carbon substances on the leased premises, and pay to the lessors as royalty ''a sum equal to one-eighth of the market price of all oil produced and sold by it'' from wells drilled by the lessee or its assigns on said premises. The lease also provided for payment to the lessors of one-eighth of the proceeds from the sale of gas or water produced from the leased premises after deduction of the cost of production, transport and sale. The defendant consented in writing to the execution by lot owners of the counterparts of the so-called Terry community lease. Various assignments of that lease were executed by the lessee. Subsequently, as the result of drilling operations under the Terry lease, oil was produced in paying quantities.

A controversy arose between the lessors and the defendant over the division of royalties received from operations under the Terry lease. The defendant claimed that it was entitled to twenty per cent of the royalties received by the lessors under the lease; that the leased premises were confined to the lot boundaries as shown on the map and did not extend to any part of the so-called roads; that it was the owner of all land designated on the map as roads and therefore of all oil and gas produced therefrom. The lessors contended that the defendant waived all right to a share of the royalties by the execution in writing of its consent to the community lease and that their title extended to the center of the roads depicted on the map as contiguous to their lots. Conflicting

claims to proceeds from the sale of gas produced from the drilling operations under the lease also arose. The plaintiff thereupon commenced the present action.

The trial court found and concluded that there had been no dedication to public use of any land designated on the map as roads; that the plaintiff owned only the 2,500 square feet in each lot described in the deed; and that the defendant was the owner of the 31.94 acres included within the subdivision designated on the map as roads. The decree quieted the title of the plaintiff to the 2,500 square feet represented by each of the lots, subject to the exclusive right of the defendant for a period of fifty years to drill for oil, gas and other hydro-carbon substances. It decreed that the defendant was the owner in fee of the 31.94 acres contained within the boundaries of the roads depicted on the map.

The plaintiff assigns error in the foregoing conclusions. He invokes sections 831 and 1112 of the Civil Code providing respectively that "an owner of land bounded by a road or street is presumed to own to the center of the way; but the contrary may be shown," and "a transfer of land, bounded by a highway, passes the title of the person whose estate is transferred to the soil of the highway in front to the center thereof, unless a different intent appears from the grant." He also relies on *Allan* v. *City and County of San Francisco*, 7 Cal.2d 642, 646 [61 P.2d 1175], where it was said that a transfer of land by lot and block number carries the title of the grantee to the center of the street in front of the land conveyed.

It is an undisputed fact in this case, however, that the roads as depicted on the recorded map did not exist in fact. The cases relied on by the plaintiff involved streets or highways which had an actual existence, and it is obvious that the provisions of the code sections relate to streets and highways which have an actual or prospective existence for the use of the abutting land. (See *Elliott* v. *McIntosh*, 41 Cal. App. 763 [183 P. 692]; 4 Cal.Jur. 380.) It cannot seriously be contended that the roads shown on the map had such an existence. Public rights are not involved, nor is anyone in this action seeking to establish any rights in behalf of the public. In fact it was stipulated that there was no intention to improve any part of the 31.94 acres as roads or streets for subdivision purposes, but that the entire area, including the 31.94 acres, was intended to be used for mining pur-

poses only, and none thereof for residential purposes. It becomes apparent from the stipulated facts and the documentary evidence that the purpose of the recorded map showing a subdivision in lots and blocks was to provide a convenient method of fixing the extent of each lot owner's right to participate in the proceeds from sale of oil produced from the tract. There was therefore never any intention to open any such roads. Consequently there never was any land or any "lots" in the tract "bounded by a road of street" or "bounded by a highway," as contemplated by said sections 831 or 1112. There is therefore no occasion to apply the rules laid down in those sections to the facts of this case. The conclusion of the trial court that each of the lots conveyed to the plaintiff's predecessor in interest was 2,500 square feet in area and that title did not extend to the center line of the roads depicted on the map, is therefore sustained by the record.

The court also decreed the parties' respective rights in oil and gas. It determined that the plaintiff was entitled to eighty per cent and that the defendant was entitled to twenty per cent of the net profits from the sale of oil produced on the 151.5151 acres contained within the blocks as shown on the map; that the defendant was entitled to the proceeds from the sale of all oil, gas and other hydro-carbon substances produced from the 31.94 acres, and to the proceeds of all gas produced from the 151.5151 acres; and that the defendant did not relinquish any of its rights to twenty per cent of the royalties payable under the community lease by its consent to the execution thereof by the owners of lots. The plaintiff also questions the correctness of those conclusions of the trial court.

Apparently the trial court was of the view that the defendant's fee title in the 31.94 acres governed its rights in the oil and gas produced therefrom. Had there been nothing more involved in this case than the grants of lots to the various purchasers, there might have been some foundation for such an assumption. But here the participation rights do not flow alone from the grants of land. ■ The deeds qualified the grants by a reservation of the drilling rights for a stated period, and by a transfer of participation benefits therein to the grantees; and co-incidentally a drilling contract was entered into by the grantor with each prospective lot owner. Those instruments—the deed and the drilling

contract—were part of one transaction and must be construed together. (Sec. 1642, Civ. Code.)

Undoubtedly the defendant had reserved from the grant to the plaintiff the exclusive right to drill ''on said quarter section,'' including the plaintiff's lots, for a period of fifty years. It had reserved a similar right as to all the land sold in the tract. It might not exercise its right to drill on every lot sold, and neither the purchaser nor the defendant intended that it should do so. But in order to share in the actual drilling operations in the tract and to procure capital to finance the operations, each purchaser furnished funds and pooled his interests with all the other purchasers in return for a proportion of the net profits from oil produced thereby. By the language of the instruments the scheme connoted a proportionate share to every lot owner in every well drilled anywhere in the tract under the drilling contract. Drilling was the only intended use of any of the land in the tract. At the outset the sale of lots in the tract was the only source of capital. Respective participation benefits in the net profits from the operations so financed were therefore proportioned, eighty per cent to the grantee-investors and twenty per cent to the corporation.

From the language of the deed and the drilling contract it becomes obvious that the reserved right to drill for oil ''upon said quarter section,'' and the parties' respective shares in the profits were corelative and interdependent. They were created to exist for a period of fifty years. The respective rights of participation in net profits during that period extended to any well drilled in any part of the tract, and were not limited to wells drilled on the lots conveyed to the various purchasers. All of the land in the tract was put into the fifty year oil development ''pool,'' and not merely the acreage contained within the lots as depicted on the recorded map. To say, as the trial court said, that the plaintiff is entitled to 2/2640ths of eighty per cent of the net profits from oil produced on the 151.5151 acres, and that the defendant is entitled to all the oil, gas and other hydro-carbon substances produced from the 31.94 acres, is to add language to the contract which the parties obviously did not include.

It also appears that the trial court erred in concluding that the defendant was entitled to all the gas from the entire tract. The provisions of the grant and of the drilling contract must likewise be deemed to govern the rights of the

parties with reference to participation of proceeds from the sale of gas. Those provisions must be considered in the light of the fact that gas and oil in place are inseparable and both are brought to the surface in drilling operations. It is true, as stipulated by the parties, that at the time the deed and drilling contract were executed, gas was not considered of any value and was not expressly mentioned in those instruments. Nevertheless the participation right of the corporation under the drilling contract was twenty per cent "as its share and proportion of the net production of said well or wells." The expression "net production of said well or wells" is all inclusive. The language of reservation in each instrument referred expressly to oil drilling rights, but inasmuch as it also reserved twenty per cent of the "net production" from the wells, we must conclude that the language of reservation excepted also from the grant a proportionate share of the proceeds from gas and other hydro-carbon substances in addition to oil; and that all else passed to the grantee. (Sec. 1069, Civ. Code.) The proportionate shares of the parties in the sale of the proceeds from gas under the drilling contract and deed, as so read together, are therefore the same as in the case of the proceeds from oil.

■ The evidence sufficiently supports the trial court's conclusion that the corporation by its consent to the execution of the community lease, did not waive any of its rights to participate in the royalties payable under the lease to the extent of twenty per cent. The estate reserved by the defendant was not an estate in perpetuity, but was an estate created for a term of years. (*Dabney-Johnston Oil Corp.* v. *Walden,* 4 Cal.2d 637 [52 P.2d 237].) The defendant granted to the lot owners a similar estate in the lands in the tract which were owned by it. By the express language of the drilling contract, the purchaser's right to participate in profits was considered by the parties as a covenant running with the land. The co-existent rights of the parties—plaintiff to receive and the defendant to retain a share in the proceeds from the wells drilled in the tract—were therefore inseparable from the land for the duration of the limited estates. The trial court was therefore justified in concluding that the purpose of the community lease was to effect a more satisfactory arrangement for compensating drilling operations when sufficient capital was not procurable from sale of lots; and that there was no waiver by the defendant of any right to participate in royalties or profits received therefrom.

From the foregoing it follows that the judgment should be and it is hereby modified to provide as to the participation rights of the parties (1) that the plaintiff is entitled, for a period of fifty years from February 1, 1922, to that proportion of eighty per cent of the profits or royalties received from sale of oil and gas produced from wells drilled in any part of said tract under the drilling contract or the community lease which the lots owned by the plaintiff bear to the total number of lots in the tract, namely 2/2640ths of said percentage; and (2) that defendant is entitled to retain the remaining twenty per cent of the profits or royalties from sale of oil and gas produced from wells drilled in said tract under the drilling contract or the community lease for the same period.

As so modified the judgment is affirmed, neither party to recover costs on appeal.

Gibson, C. J., Curtis, J., Carter, J., and Schauer, J., concurred.

TRAYNOR, J., dissenting.—It is my opinion that when the defendant consented to the Terry lease it relinquished its right to participate in the profits from operations under that lease. The lease provides explicitly for the disposition of profits from the wells, permitting Terry to retain seven-eighths of the price for oil produced, and requiring him to pay one-eighth to the lessors. Having consented to this lease and reserved only its rights "in, on, or to any lot or lots not leased to Zeb A. Terry," defendant was bound by the terms of distribution provided in the lease. Moreover, under its contract with plaintiff, defendant had no more than the right to 20 per cent of the net profits arising "from the sale of oil derived from any well or wells which the East Coalinga Oil Fields Corporation may drill." Nowhere in this language is there a basis for the reservation of a right to profit from wells drilled by others after defendant waived its exclusive right to drill.

Nor can I agree with the majority opinion that Civil Code sections 831 and 1112 relate only to streets and highways that have "an actual or prospective existence for the use of the abutting land." It has been the established law of this state that a conveyance describing the property by reference to a recorded map that shows the property bounded by a street, passes the grantor's title up to the center of the street even though the dedication of the street was never accepted, or

the street was never opened or improved (*Brown* v. *Bachelder,* 214 Cal. 753 [7 P.2d 1027]), or it was abandoned before the conveyance was made. (*Anderson* v. *Citizen's Savings & T. Co.,* 185 Cal. 386, 393 [197 P. 113]. See also *Allan* v. *City and County of San Francisco,* 7 Cal.2d 642, 649 [61 P.2d 1175]; *Gramer* v. *City of Sacramento,* 2 Cal.2d 432, 438 [41 P.2d 543]; *Machado* v. *Title Guarantee & T. Co.,* 15 Cal.2d 180, 185 [99 P.2d 245]; Tiffany, Real Property, (3rd ed. 1939) 106, 107.) This court expressly withheld approval of dictum to the contrary in *Elliott* v. *McIntosh,* 41 Cal.App. 763, 769 [183 P. 692], relied upon in the majority opinion.

Edmonds, J., concurred.