[Civ. No. 3768.   Fourth Dist.   Apr. 28, 1949.]

EAST COALINGA OIL FIELDS CORPORATION (a Corporation), Appellant, v. PURE OIL COMPANY (a Corporation) et al., Respondents.

W. Eugene Craven and Margaret A. Flynn for Appellant.

Barstow & Barstow, Thomas F. Lopez, Iener W. Nielsen, Harold V. Thompson, Dockweiler & Dockweiler, Thomas A. J. Dockweiler, Mortimer Kline, Ben A. Harper and E. S. Morris for Respondents.

BARNARD, P. J.—This is an appeal from a judgment in an action for declaratory relief.

In 1919, a tract of about 183 acres was subdivided into the equivalent of 2,640 lots for the purpose of oil development. The plaintiff, which will be referred to as East Coalinga, acquired title to this tract and sold a large number of the lots at a price of $110 per lot. Each purchaser of a lot executed a drilling contract with East Coalinga and upon payment of the purchase price received a deed. These instruments provided that for a period of 50 years East Coalinga should have the exclusive right to drill for oil upon the entire tract; that the purchasers should receive a proportionate share of 80 per cent of the net profits from the sale of oil from any well or wells which East Coalinga might drill on any part of the tract; and that East Coalinga should retain 20 per cent of said net profit. It was provided that each purchaser should thus share in the profits in proportion to the number of lots he owned, as compared with the total number of lots in the tract. There was a further arrangement by which East

Coalinga was to set apart 30 per cent of all money received from the sale of lots to establish a fund to carry on drilling operations. East Coalinga commenced drilling an oil well in April, 1921. In May, 1923, the drilling fund became exhausted, operations were abandoned and the equipment was lost by foreclosure.

In 1938, oil was discovered in the vicinity of this tract and efforts were resumed to again bring about drilling operations in the hope of developing oil on this tract. Counterpart leases constituting a community oil and gas lease with Zeb A. Terry, as lessee, were executed by the owners of all of the 2,640 lots with the exception of 62 lots. These counterpart leases provided that they should be construed as one lease, and that Terry should have the exclusive right to drill for and produce oil, gas, etc., on the leased premises. They also provided that a one-eighth royalty should be paid by the lessee to the lessors, respectively. East Coalinga consented in writing to the execution by lot owners of the counterparts of the Terry community lease. By various assignments the counterparts of the Terry community lease were transferred to the Pure Oil Company, Pacific Western Oil Corporation, and George F. Getty, Incorporated, which will be referred to as the oil companies. Subsequently, as a result of drilling operations carried on by the oil companies under the Terry lease, oil was produced in paying quantities. For some five years the oil companies paid the one-eighth royalty to the respective lot owners in accordance with the terms of the community lease.

In a former action brought by the owner of two lots in this tract (*MacNicol* v. *East Coalinga etc. Corp.*, 22 Cal.2d 742 [140 P.2d 793]), East Coalinga contended that under its original drilling contracts it was entitled to 20 per cent of any royalties received by the lot owners under the terms of the community lease. The plaintiff in that action contended that East Coalinga had waived its right to a share of such royalties by executing its written consent to the community lease. The court held that the evidence in that case was sufficient to support the trial court's conclusion that East Coalinga, by consenting to the execution of the community lease, had not waived its right to 20 per cent of the one-eighth royalty payable under the community lease. Most of the preliminary facts are more fully set forth in the opinion in that case.

In June, 1945, East Coalinga brought this action for declaratory relief, naming the oil companies and some 70 individual

lot owners as defendants. The complaint alleged the execution of the original contracts and deeds with the lot owners, with a reservation of 20 per cent of the profits to East Coalinga; that East Coalinga had drilled a well to a depth of 4,780 feet, and otherwise fully performed the original drilling contracts; the execution of the counterparts of the Terry community lease; the assignment of the community lease to the oil companies; the execution of new drilling contracts between East Coalinga and the oil companies as successors to the rights of Terry under the community lease; and the production of oil on the tract by the oil companies. A judgment was prayed for decreeing that East Coalinga is the owner of and entitled to, for the period of 50 years from February 1, 1922, 20 per cent of all profits or royalties from oil and gas produced under the terms of the community lease. Various answers and a cross-complaint were filed. At the hearing it appeared that there are only five shares of stock in East Coalinga outstanding, and that four of these are owned by one man.

The court found in all respects in favor of the defendants finding, in addition to other facts, that on May 19, 1939, East Coalinga executed drilling contracts with the oil companies; that the oil companies had drilled wells and were producing oil, and were performing said contracts in accordance with their terms; that since February, 1941, the oil companies have paid to the respective lot owners the proportionate one-eighth royalty provided for in the community lease, in accordance with the terms of that lease; that the owners of 2,578 lots in the tract have executed counterparts of the Terry community lease; and that East Coalinga, as the owner of 470 lots in said tract, executed one of the counterparts of the Terry community lease. The court concluded that by executing the written consent to the community lease and the new drilling contracts with the oil companies dated May 19, 1939, East Coalinga waived and relinquished its right to participate in any of the profits or royalties derived or resulting from operations under the Terry community lease as to each and all lots in said tract, except as to lots therein which were wholly owned by East Coalinga and except as to any lot or lots not then or thereafter covered by the Terry community lease. Judgment was entered accordingly and East Coalinga has appealed.

The appellant mainly relies on the decision in *MacNicol* v. *East Coalinga etc. Corp., supra,* as conclusively deter-

mining that it has not waived its right to 20 per cent of the one-eighth royalty payable to the other lot owners under the community lease, and as being controlling here. Not only are the parties and some of the issues different here, but important additional evidence here appears which was not presented in the former action. Under these circumstances the decision thus relied on is not controlling here. (*Standard Oil Co.* v. *J. P. Mills Organization,* 3 Cal.2d 128 [43 P.2d 797]; *Nickey* v. *Stearns Ranchos Co.,* 126 Cal. 150 [58 P. 459].)

The appellant further contends that, in any event, the evidence is not sufficient to support the court's findings to the effect that it had relinquished and waived its rights to 20 per cent of the royalties accruing to the other lot owners under the terms of the community lease. It is argued that under the original deeds and drilling contracts executed by the lot owners East Coalinga had the exclusive right to drill for oil for a period of 50 years, with the right to receive 20 per cent of the profits from any wells drilled by East Coalinga, its successors or assigns; that the consent to the community lease which was executed provided that nothing therein should affect the rights of East Coalinga in connection with any lot in the tract which was not leased to Terry or the Pure Oil Company; and that East Coalinga's consent to drilling operations by third parties could not alter its right to 20 per cent of the royalties which had theretofore been expressly reserved to it.

The consent to the execution of the Terry community lease by other lot owners, which was executed by East Coalinga, recites that East Coalinga "hereby consents to each and every lease agreement bearing date July 19, 1938, heretofore given to Zeb A. Terry by the owners of any lot or lots" and to each such lease agreement in similar form and bearing the same date thereafter given to Terry or the Pure Oil Company by the owners of any lot before July 1, 1940. It also recites:

"It is specifically understood and agreed that nothing herein stated shall affect the rights of the East Coalinga Oil Fields Corporation in, on or to any lot or lots in the said quarter section not leased to Zeb A. Terry or the Pure Oil Company, in accordance with the aforesaid lease agreement."

The resolution of the Board of Directors of East Coalinga authorizing the execution of this consent to the Terry lease now appears in evidence. That resolution recites:

"WHEREAS, it appears that the lots (in this subdivision) have been involved in such a way that there has been no development of said lots for many years last past, and it further appearing that said drilling agreement originally entered into upon said lots is impracticable and impossible of performance;"
that it appears that the owners of over 2,150 of the lots have signed the lease covering said lots; and that it would be to the best interest of the lot owners and of the corporation that consent to said lease on said lots be given. It is then resolved that the corporation consent to each and every lease given to Terry, and that the president and secretary be authorized to execute such consent for the corporation. It is then provided that this consent is given subject to the understanding that no lot shall be quitclaimed by Terry or his assigns "except with the express agreement that said lots shall continue to share in production on said remaining lots in said quarter section, whether such production has commenced at said time or thereafter commenced."

East Coalinga also executed two counterparts of the Terry community lease covering 470 lots still owned by it, together with any right, title and interest it might have in and to the streets in the subdivision.

Also, under date of May 19, 1939, East Coalinga executed two "drilling contracts," one with Pacific Western Oil Corporation and George F. Getty, Incorporated, and the other with the Pure Oil Company, giving them the right to drill on the south five-eighths and the north three-eighths, respectively, of this tract. Each of these contracts recited that all deeds conveying lots in this tract which had previously been executed had reserved in East Coalinga for a period of 50 years the exclusive right to drill for oil; that a great majority of the owners of lots have, by community lease dated July 19, 1938, leased their respective lots to Zeb A. Terry; that Terry has assigned and conveyed said community lease and every counterpart thereof to Pacific Western-Getty or the Pure Oil Company; that East Coalinga had theretofore executed a written consent to this community lease and its counterparts; that East Coalinga believes it is to the best interest of the respective owners of lots in the subdivision that the mineral rights therein and thereunder be developed under and pursuant to the terms and conditions of the community lease of July 19, 1938; and that East Coalinga desires to fully

protect and conserve the interests of all lot owners who have not already leased their lots under the said community oil lease. It is then provided that any lot owners who have not already signed the community lease may do so, that the oil companies shall have the right to drill on this subdivision until it is fully developed, and that East Coalinga will not drill on any lots not covered by the community lease.

A part of Paragraph 7 of these two drilling contracts, except that a different oil company and a different parcel are named in one, reads as follows:

"7. If, as and when, any well is or wells are drilled and completed by Pacific Western-Getty on said South five-eighths (S ⅝) of said fractional quarter section, Pacific Western-Getty shall account to the owners of the lots in said East Coalinga Oil Fields Subdivision who have executed the aforesaid Community Oil and Gas Lease for their proportionate share of the proceeds of production therefrom as provided for in said Community Oil and Gas Lease, and East Coalinga does hereby waive any and all right, title and interest in and/or to any portion of the royalty accruing to such lot owners under said Community Oil and Gas Lease."

Paragraph 7 then goes on to provide that the oil companies shall pay to East Coalinga "for division and distribution between itself and the owners of lots in said East Coalinga Oil Fields Subdivision who have not executed said Community Gas and Oil Lease" a certain portion of the proceeds from any oil wells, which is to be determined in accordance with the formula therein set forth.

Paragraph 17 of these new drilling contracts provides that:

"Anything in this agreement to the contrary notwithstanding, it is specifically understood and agreed that by virtue of this agreement East Coalinga shall not waive any of its rights to royalties or otherwise under and by virtue of any property owned by it and subject to the Community Oil and Gas Lease executed by East Coalinga dated July 19, 1938. It is further understood and agreed that it shall not affect East Coalinga's right to any royalty or other bonus by virtue of any subsequent execution upon any property which it may have of a counterpart of said Community Oil and Gas Lease."

Paragraph 16 of these drilling contracts reads: "This agreement is made subject to all existing rights of record."

There is also evidence that for approximately five years before this action was brought the oil companies paid the one-eighth royalty called for by the community lease to the

respective lot owners, without objection being made by East Coalinga.

The appellant argues that Paragraph 17 of the new drilling contracts, as above quoted, discloses that it did not waive any of its rights under the community lease, and that Paragraph 16 required the oil companies to pay royalties to the owners of the record title, as their interests may appear. Paragraph 17 was clearly intended to obviate any possibility that the waiver otherwise provided for in the contract might be taken as affecting East Coalinga's right to its one-eighth landowner's royalty in connection with the lots owned by it, some 470 in number. Paragraph 16 was a general expression that title was not warranted, and was obviously not intended to nullify the specific agreements contained in the contracts.

A peculiar situation appears here. Originally, the lot owners gave an exclusive right to drill to East Coalinga, which was to receive only 20 per cent of the profits since the lot owners were supplying the funds with which to conduct drilling operations. Those operations were a failure, the funds were exhausted, and active work was abandoned for some 15 years. All parties were then interested in renewing the operations. East Coalinga was unable to operate under its old drilling contracts. No one could take an assignment and operate under them, as they called for an 80 per cent royalty to the lot owners. Of necessity, a new plan and new contracts were called for. Nearly all of the interested parties joined in the new plan, which took the form of a new community lease.

It seems rather clear that the intention was to substitute new terms and conditions for those which had originally been provided. Most of the individual lot owners gave a new exclusive lease to the oil companies and East Coalinga not only consented thereto but joined in that community lease with respect to the lots it still owned. Also, and as a part of the same general scheme, East Coalinga executed new drilling contracts with the oil companies, agreeing that the oil companies should pay royalties to the lot owners as provided for in the community lease to which it had consented, specifically waiving its right to such royalties, and providing, with respect to any lots which had not joined in the community lease, that it should receive a certain proportion of the royalties which it might divide between itself and the owners of those lots. It was further specifically provided in those new drilling agreements that East Coalinga did not waive its right to

royalties in connection with the lots which it still owned and which it had placed under the community lease. It hardly seems reasonable to believe that it was intended, under this new arrangement, in which East Coalinga participated after stating that their original drilling contracts were impracticable and impossible of performance, that the lot owners should pay two sets of drilling royalties or that they should continue with an obligation to pay East Coalinga for something it admittedly could not do and obviously would not attempt. Under the facts now disclosed, which are undisputed, it rather clearly appears to have been the intention of East Coalinga to relinquish its rights under the old drilling contracts, including the royalties therein provided for, and to join the new common enterprise with respect to the large number of lots which it still owned. In addition, the practical interpretation made by the parties themselves in paying royalties to the various lot owners and allowing this to be done over a period of practically five years, is most suggestive. In our opinion the evidence, with the reasonable inferences therefrom, fully supports the findings of the court which are material here.

It further appears, in the evidence in this action, that the streets in this subdivision had been formally dedicated to public use and regularly accepted for that purpose. However, this is immaterial for the reason pointed out in *MacNicol* v. *East Coalinga etc. Corp., supra*. It further here appears that during the 15-year interval between 1923 and 1938, more than 1,000 of these lots were sold to the state for taxes. A number of the respondents acquired ownership of their lots through deeds from the state, or are the successors in interest of persons who thus acquired title to their lots. These respondents make the additional point that as purchasers from the state they took title freed from any claim that East Coalinga might have had for 20 per cent of the royalty under its original drilling contracts. While there seems to be merit in this contention it is unnecessary to consider this point, as well as certain other points made by the respondents, in view of our holding on the main issues involved.

The judgment appealed from is affirmed.

Griffin, J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 27, 1949. Carter, J., voted for a hearing.