[Sac. No. 4732. In Bank.—February 19, 1935.]

S. E. GRAMER, as Administratrix, etc., Plaintiff and Appellant, v. THE CITY OF SACRAMENTO (a Municipal Corporation) et al., Respondents; HELEN VAN GULPEN HARRIS, as Administratrix, etc., Intervener and Appellant.

Chauncey Tramutolo, Lemuel D. Sanderson, Elliott, Atkinson & Sitton and Orrin Kipp McMurray for Plaintiff and Appellant.

Helen Van Gulpen Harris, *in pro. per.,* and Eloise B. Cushing for Intervener and Appellant.

Hugh B. Bradford, City Attorney, and R. L. Shinn for Respondents.

Devlin & Devlin & Diepenbrock, as *Amici Curiae* on Behalf of Respondents.

THOMPSON, J.—We are concerned in this case with an appeal by the plaintiff as well as one by the intervener from a judgment rendered after trial in favor of the defendants. The action was commenced to compel the City of Sacramento to execute a reconveyance of certain parcels of land to the plaintiff for the benefit of the heirs of John A. Sutter, Jr., and the complaint in intervention claimed the land for the heirs of John A. Sutter, Sr. The contest arises out of the following facts:

By an ordinance of the City of Sacramento passed January 31, 1924, the city abandoned Seventeenth Street between B and C Streets and the alleys in the block bounded by B, C, Sixteenth and Seventeenth Streets. This property is the subject of the action. The source of title goes back to John A. Sutter, Sr., who acquired the land upon which Sacramento is situated from the Mexican government. On October 14, 1848, John A. Sutter conveyed the property to his son John A. Sutter, Jr., who laid out the city with lots, squares, streets and alleys, the survey and map thereof having been made by Captain William H. Warner. Sales of lots by reference to the map were made and by January 2, 1849, there were nine or more lot owners to whom conveyances had been made. On that date Sutter, Jr., executed a quitclaim deed which in its material parts reads as follows:

"Know All Men By These Presents: That I, John A. Sutter Jr. of Sacramento City in the Teritory of California have this day conveyed and quit claimed and by these presents do convey and quit clame unto the present & futerer owners of Town lots and town property in Sacramento City in the teritory of California all my right title & Interest in and to cirtain portions of said City discribed as follows and under the conditions following, That is to say all the streets & Alleys in said City except so much of L and Twenty-seventh streets and of all alleys runs into or threw any part of Sutters Fort, said portions of said streets & Alleys being reserved to myself said streets & alleys hereby conveyed to be

kept for Public use under such conditions & regulations as the future authoritys of said Citty may deturmine & initel said City shall be incoperated & City authorityes established Frount Street shall be subject to the exclusive use of the owners of lots frunting on said frunt Street in such manner that the owners of each lot or part of a lot fronting on said street shall have the exclusive use of all the ground lying immediately opposite his lot or part of a lot, and betwene such lot or part of lot & the river but all the cross streets such for instance as L, M, and others shall remain at all times open for Public use and also the entire following squares in said City, to wit [Here follows designation of certain squares.]

"The said several squares are hereby conveyed unto the present & future propriators of town property in said City for the public use of the inhabitance of said City to be applyed to such public purposes as the future incoperated authoritys of said City from time to time declare and deturmin. To have & to hold the aforesaid primesis unto the present & Future owners of town property in said City the heirs & assigns forever upon this exspress condition that I reserve to myself my heirs & assigns all ferry Priveledges that I now have or may hereafter acquire on & upon aney or all of the aforesaid primesis.

"In testimoney whareof I have hirento set my name and affixt my seale the 2nd day of January in the yeare of our Lord eighteen hundred and forth nine.

"signed sealed & delivered in Presents of

"John A. SUTTER JR (seal)"

In general it is the contention of appellant that the deed conveyed the property to the city upon an express condition that it should be used exclusively for street and public purposes, and that by reason of the abandonment there has been a reversion of the title to her—or if the deed is to be treated as a dedication the abandonment has left the title in the grantor, his heirs and representatives. The position of the intervener is substantially the same, except that she claims as the result of deeds between John A. Sutter and his son that the reversion is to the heirs of John A. Sutter, Sr. At the time the deed was executed the City of Sacramento was not incorporated, that legal formality not occurring until February 27, 1850. After its incorporation, however, the

deed was accepted and the streets therein designated have been used as public thoroughfares down to the present time, except those which the evidence discloses to have been abandoned. A series of thirteen ordinances abandoning streets were introduced in evidence, the first having been adopted December 1, 1862, and the last on February 10, 1921. Evidence was introduced by the defendant municipality concerning the use of the vacated areas, from which it appears that the abandoned streets have been put to a variety of uses, such as residential, industrial, railroad, schools and capitol building, apparently, as counsel says in his brief ''upon the assumption, throughout the more than sixty-five years during which those vacations have taken place, that the owners of the property abutting on the vacated streets and alleys were also the owners of the fee to the middle of such streets and alleys and that as the owners they were entitled to take over possession and use as their own the vacated areas. . . . ''

The particular deed of January 2, 1849, has been before this court, with respect to the question of whether it sufficiently designated a grantee or grantees, and also with reference to the construction of that portion which grants the squares for public purposes. The first case is that of *Mayo* v. *Wood*, 50 Cal. 171, wherein Mesick, as a grantee of Sutter, claimed title to certain of the squares designated in the deed, and we find on page 175 language material to the disposition of the present controversy. We there read: ''The instrument executed by John A. Sutter, Jr., on the 2nd day of January, 1849, dedicated the land in controversy to public use, to be applied 'to such public purposes as the future incorporated authorities of said city may from time to time declare and determine'. It purported in terms to convey whatever title he had to 'the present and future owners of town lots and town property in Sacramento City'. It recognized the fact that there were such 'present' owners and that Sacramento was then known as a city, though not at that time formally incorporated as such. Aside from the question of dedication, the instrument was operative as a conveyance to vest the title in the then 'present' owners of the town lots and property. This was a sufficient designation of the grantees to uphold it as a conveyance, *and thereafter Sutter, Jr., had no title to this property which could*

*pass by his deed to Mesick."* (Italics ours.) The second case involved the right of the City of Sacramento to use one of the squares mentioned in the latter half of the deed, for the erection and maintenance of a municipal auditorium. It was determined in this latter case (*Futterer* v. *City of Sacramento,* 196 Cal. 248 [237 Pac. 48]), that the public purposes to which the property (squares) "was to be applied were to be broadly and not narrowly defined, since they were to be such as lay not so much within the present conception or intent of the grantor, or of even his immediate grantees, but were to be such as "the future incorporated authorities of said city from time to time declare and determine".

We are not inclined to follow counsel through their very interesting and learned distinctions between the civil and the common law with respect to remedies and rights upon breach of a condition subsequent. The trial court found and we are in accord with the finding that there was no condition subsequent. ■ We think, however, we might call attention to the fact that the civil law did not control all negotiations at a time subsequent to the treaty of Guadalupe Hidalgo and prior to the adoption of the first California Constitution. For a succinct *résumé* of the situation reference may be had to two statements in the first volume of the California Reports—(original and 1906 editions), the one (preface V to VIII) being a brief account of the condition of things by Hon. Nathl. Bennett, one of the first justices of this court, and the other the report of the committee on the judiciary to the state senate, dated February 27, 1850, and entitled "Report on Civil and Common Law" (pp. 588 to 604). ■ Regardless of that fact, however, the solution of this case depends upon the intention of the grantor. At the civil law, in case a doubt arises, the intention is the controlling factor (*Blain* v. *Staab,* 10 N. M. 743 [65 Pac. 177]; Schmidt's Civil Law of Spain and Mexico, tit. II, p. 99, art. 440), while under our law "conditions subsequent are those which in terms operate upon an estate conveyed and render it liable to be defeated for breach of the conditions. Such conditions are not favored in law because they tend to destroy estates, and no condition in a deed relied on to create a condition subsequent will be so interpreted if the language of the provision will bear other

reasonable construction. . . . There must be language used which is so clear as to leave no doubt that the grantor intended that an estate upon condition subsequent should be created—language which *ex proprio vigore* imports such a condition.'' (*Hawley* v. *Kafitz*, 148 Cal. 393–395 [83 Pac. 248, 113 Am. St. Rep. 282, 3 L. R. A. (N. S.) 741].) See, also, *Cullen* v. *Sprigg*, 83 Cal. 56, 64 [23 Pac. 222] ; *Behlow* v. *Southern Pacific R. R. Co.*, 130 Cal. 16, 19 [26 Pac. 295] ; *Hasman* v. *Elk Grove Union High School*, 76 Cal. App. 629 [245 Pac. 464].)

· ■ There are many reasons which compel the conclusion in the present case that no condition subsequent was intended. In the first place Sutter, Jr., was engaged in a real estate undertaking—that of subdividing and selling the lots upon which he hoped that the future city of Sacramento would thrive and expand. The growth of the city and the attending sales of lots inured to his benefit. We may assume that he was justly concerned with the profit to be realized therefrom and was desirous of attracting purchasers of lots in the subdivided property. A notion that he was to continue to own the fee of the streets would most certainly have operated to defeat his purpose—and we are not inclined to attribute any such shortsighted vision to him. In this connection we may observe that ordinarily one who lays out and sells lots in a subdivision intends to part with title to the center of the streets. (*Moody* v. *Palmer*, 50 Cal. 31; *Fraser* v. *Ott*, 95 Cal. 661 [30 Pac. 793] ; *Merchant* v. *Grant*, 26 Cal. App. 485–489 [147 Pac. 484] ; *Anderson* v. *Citizens Sav. etc. Co.*, 185 Cal. 386 [197 Pac. 113] ; *Brown* v. *Bachelder*, 214 Cal. 753 [7 Pac. (2d) 1027].) In the last-cited case it is said: ''The owner and dedicator of the street in the instant case contemplated that it should be reserved to public use. In the event of an abandonment or failure to accept a dedication, a strip of land the width of a street can be of little use to the dedicator who has parted with title to all lands on both sides of the street, as was done by the original dedicator in the instant case, and it will not in such circumstances be presumed that he intended to retain the fee as a remnant of his private estate.''

■ In the second place, we must notice the manner in which the grantor used the word ''condition''. In the *habendum* clause of the deed he says: ''To have & to hold

the aforesaid primesis unto the present & future owners of town property in said city the heirs and assigns forever upon their exspress condition that I reserve to myself my heirs and assigns all ferry Priveledges that I now have or may hereafter acquire on and upon aney or all of the aforesaid primesis.'' It cannot be seriously contended that the reservation here sought to be expressed was such by virtue of the use of the word ''condition'' as to create a condition subsequent. But when we refer back to the earlier use of the same word, which it is argued does create the condition, we find that it is also immediately followed by an exception or a reservation of so much of the streets or alleys as ran into or through any part of Sutter's Fort. We have every reason for believing that the word was employed in the same sense as when subsequently used.

■ In the third place, bearing in mind the unsettled state of affairs at the time; that the Sutters, father and son and their associates, were pioneering in a new country; that uncertainties prevailed with respect to the law which would govern their subdivision activities; and that there was no incorporated city to be named as the grantee of an easement or servitude or to accept the streets laid out by map, is not the intention apparent to convey the title to the present and future owners of lots, subject, however, to the right of the city to use them as streets and alleys? Assuming, under the stated conditions, the necessity or advisability of a conveyance to accomplish the purpose just suggested, is it not manifest that the one executed fulfilled its purpose? We observe that the deed committed the discretion not to existing city authorities, but ''under such conditions & regulations as the future authoritys of said Citty may deturmine''.

■ In the fourth place, the deed contains no words of forfeiture or reverter. It would have been a simple thing had the grantor contemplated such a possibility for him to have inserted appropriate language making provision for a forfeiture. The conclusion is almost irresistible that he had no such thought. We find in *Board of Commrs.* v. *Young,* 59 Fed. 96–105, a pertinent statement, as follows: ''Too little weight has been given to the fact that the deed was upon a valuable consideration; to the fact that it was a quitclaim of all.right, title and interest; to the fact of a

previous common-law dedication; and to the failure, under such circumstances, to make the title subject to an express right of reentry.''

In the fifth place, the construction placed upon the instrument by the city authorities and by the property owners of Sacramento, and acquiesced in by the Sutters and their heirs from 1862 down to the time of the filing of the present action, is conclusive, at least when considered with the factors already mentioned, of the question of what interpretation must be placed upon the deed. For a period of sixty years all parties concerned had proceeded upon the theory that the grantor had completely divested himself of title. It is a familiar rule, unbroken in this state, that if the meaning of the language of an instrument is doubtful the court will look to the practical construction placed upon it by the parties. (*Mulford* v. *Le Franc*, 26 Cal. 88–110; *Kales* v. *Houghton*, 190 Cal. 294–300 [212 Pac. 21], and cases cited.)

Finally, the language of *Van Ness* v. *City of Washington*, 4 Pet. (29 U. S.) 232–281 [7 L. Ed. 842], is so apt and so pertinent that we simply quote: ''And in construing this agreement, this fact should never be lost sight of. It is obvious that the proprietors or their heirs could not be pre-sumed, for any great length of time, to have any interest in the streets or public reservations, beyond that of other inhabitants. If the city became populous, the lots would be sold and built upon, and in the lapse of one or two generations, at most, the title of the original proprietors might well be presumed to be extinguished by sales or otherwise; so that the interest of themselves or their heirs, in the streets and reservations, would not be distinguishable from that of other citizens. They must also have contemplated, that a municipal corporation must soon be created to manage the concerns, and police, and public interests of the city; and that such a corporation would and ought to possess the ordinary powers for municipal purposes, which are usually confided to such corporate bodies. Among these are certainly the authority to widen or alter streets, and to manage, and in many instances to dispose of, public property, or vary its appropriation. They might, and indeed must also, have placed a just confidence in the government, that in founding the city, it would do no act, which would obstruct its pros-

perity, or interfere with its great fundamental objects or interests.''

It is manifest from the discussion that appellants cannot complain of the judgment. It is affirmed.

Shenk, J., Curtis, J., Preston, J., Langdon, J., Şeawell, J., and Waste, C. J., concurred.

Rehearing denied.