[Civ. No. 7134. Third Dist. Aug. 30, 1945.]

COUNTY OF SACRAMENTO, Respondent, v. HERMAN LAUSZUS et al., Appellants.

Fontaine Johnson for Appellants.

John Quincy Brown, District Attorney, William A. Green, Assistant District Attorney and Albert L. Wagner for Respondent.

ADAMS, P. J.—Plaintiff's complaint in this action, in the first count thereof, alleges that plaintiff is the owner and entitled to the exclusive possession and use for a public highway of certain property described as a portion of 12th Street on a map filed for record in the office of the county recorder on April 24, 1850; that defendants without the consent of plaintiff have entered into possession of said land and wrongfully withheld possession from plaintiff. The second count incorporates the foregoing allegations and recites that defendants claim some interest in the property adverse to plaintiff, which claims are without right and constitute a cloud on plaintiff's title. A third count alleges that defendants maintain structures upon the property, thereby ousting and obstructing plaintiff and the public from use of it as a public highway. The prayer is for the recovery of possession, for a decree quieting title and enjoining defendants from asserting any adverse claims to the property.

Defendants Herman Lauszus, et al., filed an answer assert-

ing ownership of the east half of the street described in the complaint, invoking subdivisions 1 and 2 of section 315, and sections 318, 319 and 343, of the Code of Civil Procedure, as a bar to the action, alleging that plaintiff is estopped by a judgment in a prior action adverse to its contentions. They also asserted rights by adverse possession and estoppel of plaintiff by reason of laches.

After trial by the court sitting without a jury, findings of fact and conclusions of law were filed. The court found that plaintiff was the owner and entitled to the possession of the land in controversy for a public highway, that defendants' claims were without right, that plaintiff was not estopped by laches or otherwise, and that its cause of action was not barred by the statutes of limitations or any of them. Insofar as the appealing defendants are concerned, judgment was for the plaintiff, quieting its title and enjoining said defendants from maintaining any obstructions to the use of the property as a public highway.

This appeal has been taken by defendants Lauszus, Kempley and Crow and their respective wives, by whom it is contended that the findings of the court are without support in the evidence, and that the court erred in its application of the law in the respects hereinafter stated.

Plaintiff claims title to the property in controversy by virtue of a deed executed by John A. Sutter, Jr., on January 2, 1849. The pertinent portions of that instrument are as follows:

"I John A. Sutter Jr. . . . have this day conveyed and quite claimed and by these presents do convey and quite clame unto the present & futerer owners of Town lots and town property in Sacramento City . . . all my right title & Intrest in an to cirtain portions of said City discribed as follow and under the conditions follwing, That is to say all the streets & alleys in said City except so much of L and Twenty seventh Streets and of all alleys runs into or threw any part of Sutters Fort, said portions of said streets & alleys being reserved to myself said streets and alleys herby conveyed, to be kept for Public use under such conditions & regulations as the future authoritys of said Citty may deturmine & initel said City shall be incorperated & City authorityes established Frount Sreet shall be subject to the exclusive use of the owners of lots frunting on said frunt Street in such maner that the owners of each lot or part of a lot fronting on said

street shall have the exclusive use of all the grunds lyinge immediatele opposite his lot or a part of a lot, and betwene such lot or part of lot & the river but all the cross streets such for instence as L, M, and others shall remain at all times open for public use and also the entire following squares in said City to wit. . . . The said several squares are herby conveyed unto the present & future propriators of town property in said City for the public use of the inhabitance of said City to be applyed to such public purposes as the future incoporated authoritys of said City from time to time declare and deturmin To have & to hold the aforesaid primesis umto the present and future owners of town property in said City their heirs an assigns forever upon this exspress condition that I reserve to myself my heirs & assigns all ferry priveledges that I now have or may herafter acquire on & upon aney or all of the aforesaid primises. . . ."

This deed, it is to be noted, makes no reference to any map. However, plaintiff introduced in evidence several very old maps all of which show the street in controversy to be a public street; one of those maps was adopted by the Common Council of the City of Sacramento at a meeting held on December 5, 1854, the minutes of that meeting reading:

"The special committee on the report of the City Surveyor with the official map of the City reported that a copy of the same be placed on file in the City Surveyor's office, and that the Council order for the use of the City Offices ten copies providing that the cost of each shall not exceed the sum of $15.00, the payment of which to be made when completely finished, accepted and account audited for same. Report adopted."

On said map appears the following legend:

"Official Map of the City of Sacramento California compiled from actual surveys, by W. S. Watson Civil Engineer approved and declared to be the official map of the City by a resolution passed Dec. 4 by the Common Council 1854.

[Signed] R. P. Johnson, Mayor Wm. H. Watson Percival Gofs Samuel S. Cardish I R Vureyard Special Committee"

On the map is a scale, "400' to one inch," and "All streets are 80 feet in width except M and Front Sts which are 100 feet Alleys, 20 feet in width."

Another of said maps was filed for record in 1850 in Book 1 of Maps, at page 8. From another, filed for record in 1896,

it appears that the original survey was made in December, 1848, by Captain W. H. Warner, U. S. A., and a resurvey by Clement W. Coote, Civil Engineer, in December, 1849. On it appears: "Map of Sacramento City 1849." The maps are identical with respect to the area embraced, and the street in controversy appears in identical fashion on all of them.

Appellants contend that the Sutter deed did not effect a dedication of the property therein described; that it was, at most, merely an offer to dedicate which offer was never accepted; and that even if there was a dedication and an acceptance there was a subsequent abandonment when the Legislature of the state in 1874 (Stats. 1873-74, p. 191) fixed the boundaries of the city of Sacramento so as to exclude the property in controversy therefrom and providing that the area of which it is a part should thereafter constitute and be a portion of American Township in Sacramento County.

■ It may be conceded, as contended by appellants, that as a general principle of law a mere offer to dedicate land to public purposes does not become effective until same has been accepted. (9 Cal.Jur. § 41, p. 52; *Demartini* v. *San Francisco,* 107 Cal. 402, 409 [40 P. 496]; *County of Inyo* v. *Given,* 183 Cal. 415, 419 [191 P. 688]; *Diamond Match Co.* v. *Savercool,* 218 Cal. 665 [24 P.2d 783]; *People* v. *Rio Nido Co., Inc.,* 29 Cal.App.2d 486 [85 P.2d 461]; *City of Santa Clara* v. *Ivancovich,* 47 Cal.App.2d 502 [118 P.2d 303].) However, it is said in 9 California Jurisprudence, page 53, section 41, that "An important distinction is to be observed between a complete dedication and a mere offer to dedicate. In the case of a complete dedication no acceptance is required, it being presumed from the benefits arising from the dedication." (Citing *Archer* v. *Salinas City,* 93 Cal. 43 [28 P. 839, 16 L.R.A. 145]. Also see 18 C.J., § 106, p. 95, and cases there cited; 1 Elliott on Roads and Streets (4th ed.) §§ 134, 135, pp. 160-161.) In the Archer case it was said that dedication "results from the acts of the owner of the land, coupled with the intent with which he does those acts. It may be express, and completed by a single act, as when the land is dedicated by deed, or it may be implied from a series of acts as when the owner subdivides a tract of land into blocks and streets, and causes a map of such subdivision to be recorded, and sells the several subdivisions which front upon those streets."

The Sutter deed purports to make a completed conveyance

of the streets and alleys, without reservations at least as to the street here in controversy, "to be kept for Public use under such conditions & regulations *as the future athoritys of said Citty may deturmine."* (Italics ours.)

█ But even if the deed constituted a mere offer, and acceptance of the dedication was required, an acceptance of an offer to dedicate need not be express, but may be implied; and if we were to assume that the Sutter deed was a mere offer to dedicate, there is no evidence that the offer was ever withdrawn; and the evidence before the trial court is sufficient to sustain its implied finding that as a fact the dedication was accepted by the city, if not actually then impliedly. "A technical formal offer and acceptance is not requisite to dedication of a public street." (*Hall* v. *Fairchild-Gilmore-Wilton Co.,* 66 Cal.App. 615, 626 [227 P. 649].) Such acceptance may be implied. (1 Elliott on Roads and Streets (4th ed.) §§ 166-167, pp. 192-194.)

The Statutes of 1850, chapter 20, page 70 (enacted Feb. 27, 1850) fixed the original boundaries of the city as

"All that tract of land lying within the limits and boundaries hereinafter mentioned, that is to say: Beginning at the junction of the American Fork with the Sacramento River; thence down said Sacramento River to Y Street, as designated on the map or plan of Sacramento City on file in the Recorder's office in said City; thence along said Y Street east to the point where said Y Street intersects Thirty-first Street, as designated on said map; thence along the said Thirty-first Street until the same intersects the American Fork; thence along the American Fork to the place of beginning, the said boundaries extending to the middle of said Sacramento River and American Fork, shall henceforth be known by the name of Sacramento City."

It is apparent from the foregoing that there was on file when this act was passed, a map of the city which the Legislature recognized as such, that it included the area in controversy, and that the streets were named by letters up to Y and by numbers up to 31, which included the portion of 12th Street in controversy.

In the early case of *Mayo* v. *Wood,* 50 Cal. 171, 175, it was said:

"The instrument executed by John A. Sutter, Jr., on the 2d day of January, 1849, dedicated the land in controversy

to public use, to be applied 'to such public purposes as the future incorporated authorities of said city (may) from time to time declare and determine.' It purported in terms to convey whatever title he had, to 'the present and future owners of town lots and town property in Sacramento City.' It recognized the fact that there were such 'present' owners, and that Sacramento was then known as a city, though not at that time formally incorporated as such. Aside from the question of dedication, the instrument was operative as a conveyance to vest the title in the then 'present' owners of the town lots and property. This was a sufficient designation of the grantees to uphold it as a conveyance, and thereafter Sutter, Jr., had no title to this property which could pass by his deed to Mesick.''

In *Gramer* v. *City of Sacramento*, 2 Cal.2d 432 [41 P.2d 543], it is said, pages 435-436: "At the time the [Sutter] deed was executed the City of Sacramento was not incorporated, that legal formality not occuring until February 27, 1850. After its incorporation, however, the deed was accepted and the streets therein designated have been used as public thoroughfares down to the present time, except those which the evidence discloses have been abandoned.'' It was also held in that case that the deed intended no condition subsequent for the reason that Sutter, Jr., was engaged in a real estate undertaking—that of subdividing and selling the lots upon which he hoped that the future city would thrive and expand; that the deed contained no words of forfeiture or reverter, and that it would have been a simple thing to include language making provision therefor had it been intended. It also said, page 440:

"In the fifth place, the construction placed upon the instrument by the city authorities and by the property owners of Sacramento, and acquiesced in by the Sutters and their heirs from 1862 down to the time of the filing of the present action, is conclusive, at least when considered with the factors already mentioned, of the question of what interpretation must be placed upon the deed. For a period of sixty years all parties concerned had proceeded upon the theory that the grantor had completely divested himself of title. It is a familiar rule, unbroken in this state, that if the meaning of the language of an instrument is doubtful the court will look to the practical construction placed upon it by the parties.

(*Mulford* v. *Le Franc,* 26 Cal. 88-110; *Kales* v. *Houghton,* 190 Cal. 294-300 [212 P. 21], and cases cited.)''

 Also, as hereinbefore stated, the city council in December, 1854, adopted a city map which shows the streets as they appear on the earlier ones, and this may properly be construed as an acceptance of the dedication of streets made by the Sutter deed. (*Gross* v. *City of San Diego,* 125 Cal.App. 238, 246-247 [13 P.2d 820].) No other conveyance by which the city could have acquired title to the land designated on said map as streets has been shown or indicated. Also, it is obvious that when Sutter made his deed he was aware of the existence of a map and of the designation of streets by letters and numbers since said deed makes reference to many of them; and prior to his deed his father had executed deeds referring to streets and blocks. One, found in the record before us, was executed by Sutter to one Gillespie on November 3, 1849, which conveyed ''everything between east side of 10th Street and West side of 25th Street, extending from North side of A street and the American Fork River.''

We think there is ample in the record to sustain the decision of the trial court that the Sutter deed effected a dedication of the streets including the one in controversy, and that the dedication was accepted by the city.

 As for appellants' contention that there was an abandonment of the dedication insofar as the property in controversy is concerned, this is premised primarily upon the act of the Legislature of 1874 [Stats. 1873-1874, p. 191], above mentioned, which eliminated from the corporate limits of the city of Sacramento the area in controversy and provided:

''All that territory lying between the east line of Thirty-first street, on the east, and the east line of Twenty-second street, on the west, and the American River on the north, and the north line of said 'A' street, on the south; and also all of that territory bounded on the north and west by the American River (as it existed on the twenty-sixth day of May, A. D. eighteen hundred and fifty-one), and on the south by the north line of 'B' street north, and on the east by the east line of Twenty-second street, heretofore embraced within the corporate limits of the city of Sacramento, shall hereafter constitute and be a portion of American Township, in Sacramento County.''

Appellants state in their brief that when this act was passed

no attempt was made by the city to reserve any right to public roads or other easements, nor was any attempt made to accept any dedication theretofore made by Sutter and incorporated in that portion of the city which was abandoned, and, therefore, any streets which may have been indicated on any early maps and were not in use reverted to the abutting owner, citing *Elliott* v. *McIntosh,* 41 Cal.App. 763 [183 P. 692].

But in making the foregoing statement we think that appellants lost sight of the fact that what Sutter purported to convey and dedicate was not a mere right to use the land laid out as streets and alleys, to wit, an easement, but that he conveyed the title in fee; and that the city in accepting the dedication took it, not in its proprietary capacity as a private owner, but as a trustee for the ''present and future owners of town lots and town property in Sacramento City'' to whom and for whose benefit the conveyance was made; and that these property owners included not only those whose property continued to be within the limits of the city, but those whose property was excluded; that the dedication had already been accepted by the city, not piecemeal, but as a whole, and that there was no occasion for the county to accept dedication; and that when the street under consideration ceased to be in the city and became a part of the county, the trust did not fail for lack of a trustee, but there was merely a change of trustee for the public and not a surrender of the rights of the public.

(See *Board of Education* v. *Martin,* 92 Cal. 209, 216 [28 P. 799].) In 1 Elliott on Roads and Streets (4th ed.), section 127, page 147, the author says:

''A dedication, either statutory or common law, to a public corporation is not lost by changes in the form of the corporate government, nor by changes in its territorial boundaries. A dedication for the purposes of a public township road will not be lost to the public if a town or city is built up, and the road falls within its limit, nor will it be lost in cases where there is an extension of corporate limits so as to embrace county roads, nor where a village grows into a town or a town into a city. Towns, townships and cities are but trustees of the public, and, as in cases of ordinary trusts, the public trust is not defeated by a change of trustees.''

(See, also, *San Francisco-Oakland Terminal Railways* v. *County of Alameda,* 66 Cal.App. 77 [225 P. 304].)

But even if title to the area covered by the streets had re-

verted to Sutter, there is no evidence that conveyances of lots or blocks were ever made by him conveying title to any portion of the streets, either in or out of the city, and there is uncontradicted testimony in the record that prior to 1921 the entire chain of title to the property subsequently acquired by appellants shows transfers made solely by lot and block, or by block, by block number, or by block with reference to the streets that bounded it. This indicates rather clearly that at least up until 1921 no one, during the forty-seven years between 1874 and 1921, ever claimed to have any title to the lands comprising the streets and alleys. Certainly there is no evidence that Sutter ever resumed, or claimed the right to resume, title to the streets, or attempted in subsequent conveyances to convey title to the middle of a street; and it was not until 1921 that any conveyance purported to give such title.

At this point notice may be taken of the contention of appellants that by the language of the Sutter deed "the dedication was dependent upon the acts of the city authorities and neither the city authorities, nor the county authorities, ever did anything at all about the strip of land under litigation." In support of this argument appellants construe the language of the deed reading "said streets and alleys herby conveyed, to be kept for Public use under such conditions & regulations as the future authoritys of said Citty may deturmine & initel [until] said City shall be incorperated & City authorityes established Frount Sreet shall be subject to the exclusive use of the owners of lots frunting on said frunt Street," etc., as though a period had been placed after the word "established." But the deed is not so punctuated, and the language is equally subject to be construed as though a period were inserted after the word "deturmine." And we construe it to mean that until the city should be incorporated and city authorities established Front Street should be subject to the exclusive use of the owners of lots fronting on that street, and not to mean that the streets and alleys conveyed were to be kept for public use only until said city should be incorporated and city authorities established. Any other construction would be inconsistent with the prior language of the conveyance; and under the rule that the language of a grant is to be construed most strongly against the grantor who made and executed the instrument, it is not to be presumed that Sutter intended the

dedication and conveyance to be so limited as to time. As was said in *Wattson* v. *Eldridge*, 207 Cal. 314, 320 [278 P. 236], "a dedication must be understood and construed with reference to its primary object and purpose"; and since Sutter was engaged in a real estate enterprise it is not reasonable to assume that he intended that the streets and alleys conveyed should be kept for public use only until the city should be incorporated and city authorities established.

▮ Appellants devote a portion of their brief to an argument that there has been no *dedication* of the street in controversy by *use;* but if we are correct in our conclusion that there was a dedication by deed, then it is immaterial whether or not the street in controversy was or was not used as such, so as to effect a dedication by user. ▮ And if appellants mean by their argument that failure to use the street as such is evidence of an abandonment, then the principle that delay in the use does not affect the dedication, must be applied. (*Archer* v. *Salinas City, supra,* at page 51; *Davidow* v. *Griswold,* 23 Cal. App. 188, 193 [137 P. 619].)

However, the trial court has found that there was use of the street as such, and we cannot say that there is an entire lack of evidence to sustain such a finding. Its finding is that "the west one-half of the street was used by the public as a public highway almost continuously for more than sixty years last past." Miss Amy Greenlaw, the common grantor, a witness for plaintiff, testified that she was born on the Greenlaw ranch the west boundary of which was 12th Street; that her memory went back sixty or sixty-five years and that she and her parents traveled over 12th Street and her father took her to school over it; that it was also used by others whom she named, who owned property in that vicinity; that she had used the road off and on all her life; that she owned the Greenlaw property until about two years ago. Silas Orr, who had lived thirty-five years in the vicinity of 12th Street, stated that he used said street for many years—twenty years at least, and that it had always been open while he lived there; that it was used by different families, and was in fact the only outlet they had at certain times of the year—during the stormy season; that it is the same now as it always was, and a fence that runs through there is supposed to be the center of 12th Street. Gilroy E. Cottle also testified to use of the street beginning about 1919 or 1920, by himself and others.

Appellants argue that though there may have been some use of a portion of 12th Street, there is no testimony that the half of it occupied by appellants' structures was so used, and they rely upon *Tate* v. *City of Sacramento,* 50 Cal. 242, wherein it was held that if a party is and has been for many years in the occupancy of a piece of land, and the authorities claim that it has been dedicated as a public street and that his buildings thereon are a public nuisance, it devolves upon them to show affirmatively that it has been thus dedicated. But there the Supreme Court merely affirmed the decision of the trial court on the ground of insufficiency of the evidence to show that the street claimed by Tate had ever been dedicated as a public street. And reference to the record in the case shows that the area there in controversy was not embraced within the original boundaries of the city and was not included in the map made by Warner in 1848-1849; that it was covered with water and known as Sutter Lake, and was granted to the city as swamp and overflowed land in 1857 and was not embraced within the Sutter grant. The case is, therefore, not pertinent here.

Regarding the application of the various statutes of limitation relied upon by appellants, and their defense of laches, as early as 1875 the Supreme Court held, in *Hoadley* v. *San Francisco,* 50 Cal. 265, 276, where certain land had been dedicated to the public, that "Land held for that purpose, whether held by the State or a municipality, in our opinion, is not subject to the operation of the Statute of Limitations." In *People* v. *Pope,* 53 Cal. 437, 451, decided in 1879, the court said:

"Assuming that the evidence proved such actual adverse occupation for ten years or more, it must be considered as the settled doctrine of this Court, since the decision in *Hoadley* v. *San Francisco,* 50 Cal. 265, that no one can acquire by adverse occupation, as against the public, the right to obstruct a street dedicated to public use, and thus prevent the use of it as a public highway."

The holding in *Board of Education* v. *Martin, supra,* is to the same effect, the court there stating, page 218:

"There can be no adverse holding of such land which will deprive the public of the right thereto, or give title to the adverse claimant, or create a title by virtue of the statute of limitations. This rule is universal in its application to all property set apart or reserved for public use, and the public

use for which it is appropriated is immaterial. . . . The public is not to lose its rights through the negligence of its agents, nor because it has not chosen to resist an encroachment by one of its own number, whose duty it was, as much as that of every other citizen, to protect the state in its rights. This question has been determined, and these principles have already been established, in this state in the case of *County of Yolo* v. *Barney*, 79 Cal. 375 [21 P. 833], 12 Am.St.Rep. 152.''

In *San Francisco* v. *Bradbury*, 92 Cal. 414, 418 [28 P. 803], also decided in 1891, the court repeated the language used in *Board of Education* v. *Martin*, quoted above.

In *People* v. *Kerber* (1908), 152 Cal. 731, 733-734 [93 P. 878, 125 Am.St.Rep. 93], it was said: ''Property thus held by the state in trust for public use cannot be gained by adverse possession, and the statute of limitations does not apply to an action by the state or its agents to recover such property from one using it for private purposes and not consistent with the public use.'' Numerous cases are there cited.

In a more recent case, *Patton* v. *City of Los Angeles* (1915), 169 Cal. 521 [147 P. 141]), it was said at page 527 that ''adverse possession of land devoted to public use does not divest the right of the state, or other public body corporate in which the title is vested, to maintain such public use, nor in any manner affect the public right or the public use.'' The foregoing cases and numerous others were cited in support of the conclusion of the court.

In *Humboldt County* v. *Van Duzer* (1920), 48 Cal.App. 640, 644-645 [192 P. 192], the court said that mere nonuser of an easement acquired by grant does not amount to an abandonment; and it added:

''If mere nonuser shall be held to be an abandonment of a public highway or street, every encroachment or nuisance on the public highway would effect an abandonment to the extent of the encroachment. The negligence of the public authorities in not removing the encroachment or obstruction would then be a legal substitute for the formal action or proceeding of abandonment provided by law. In that case the possessor by thus separating the public use from the fee could, by a system of 'divide and destroy,' acquire title by adverse possession in face of the long line of well-established authority to the contrary.''

(Also see *Visalia* v. *Jacob* (1884), 65 Cal. 434, 435-436

[4 P. 433, 52 Am.Rep. 303] ; *County of Yolo* v. *Barney* (1889), 79 Cal. 375, 378 [21 P. 833, 12 Am.St.Rep. 152] ; *Daly City* v. *Holbrook* (1918), 39 Cal.App. 326, 329 [178 P. 725]; *Richert* v. *City of San Diego* (1930), 109 Cal.App. 548, 554 [293 P. 673] ; *Henry Cowell Lime & Cement Co.* v. *State* (1941), 18 Cal.2d 169, 172 [114 P.2d 331].)

Appellant relies upon *People* v. *Osgood*, 104 Cal.App. 133 [285 P. 573], and *County of Tehama* v. *Pacific Gas & Electric Co.*, 33 Cal.App.2d 465 [91 P.2d 936], as holding that the People are bound by the same rules as an individual in the application of statutes of limitation. But neither case is applicable here, since the rule of the cases hereinbefore cited must be held to be an exception to that applied therein.

 In support of its contention that respondent is barred by laches, appellants cite *City of Los Angeles* v. *Cohn*, 101 Cal. 373 [35 P. 1002], *McGee* v. *City of Los Angeles*, 6 Cal.2d 390 [57 P.2d 925], and *Times-Mirror Co.* v. *Superior Court*, 3 Cal.2d 309 [44 P.2d 547]. While in the first of said cases the Supreme Court did affirm a judgment based upon an estoppel *in pais*, it is to be noted that in so doing it recognized the general rule that the laches of municipal officers cannot defeat the rights of the public in streets, and strictly limited its decision to the facts there appearing, which included evidence that the city, before the erection of structures upon the strip of land in controversy, had expressly agreed that it did not own the land, and that upon the faith of that agreement the buildings had been erected some twenty years prior to the commencement of the action. Similar exceptional circumstances appear in the other two cases relied upon. In none of them was mere delay or inactivity held to estop the governmental agency; and that is the sole ground for appellants' invocation of estoppel in this case. In fact, in one of the cases cited and relied upon by appellants, *City of Sacramento* v. *Clunie*, 120 Cal. 29 [52 P. 44], the court said that a delay of forty years in bringing an action of ejectment to recover lands claimed to have been dedicated as public streets, during which delay large sums of money were expended in permanent improvements by defendant and his grantors, did not estop the city from maintaining an action in ejectment, if the streets were, in fact, dedicated to public use; and *City of Los Angeles* v. *Cohn, supra,* was said not to be comparable in its facts.

It is said in 2 Elliott on Roads and Streets (4th ed.), page 1697, section 1189, that "an estoppel cannot exist where the knowledge of both parties is equal and nothing is done by the one to mislead the other."

(Also see *Gross* v. *City of San Diego, supra,* at page 246, citing and quoting from *Davidow* v. *Griswold, supra; Archer* v. *Salinas City, supra,* at page 51.)

We find no error in the record, therefore the judgment is affirmed.

Peek, J., and Thompson, J., concurred.