[No. C068816. Third Dist. Nov. 26, 2012.]

KELLY C. WOOSTER, Plaintiff and Appellant, v.
DEPARTMENT OF FISH AND GAME et al., Defendants and Respondents.

COUNSEL

Christopher D. Williams for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Assistant Attorney General, Sara J. Russell and Randy L. Barrow, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**ROBIE, J.**—In this quiet title action, plaintiff Kelly C. Wooster sought to establish that property he owns in Calaveras County is free and clear of a conservation easement recorded on the property over 30 years ago either because the Department of Fish and Game (the department) failed to post no hunting and no trespassing signs on the property as required by the conservation easement deed and agreement or because the grant of hunting rights to the department was void from the outset. The trial court sustained the department's demurrer without leave to amend and dismissed the action.

On Wooster's appeal, we agree with the trial court that Wooster is not entitled to the relief he seeks. Even if the department failed to comply with its obligation to post signs on the property, that failure did not extinguish the conservation easement or give Wooster a basis for rescinding the easement. Furthermore, the grant of hunting rights to the department, so that the department could prohibit all hunting on the property, was entirely legal and consistent with the statutes governing conservation. easements. Accordingly, we will affirm the judgment of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

Taking the factual allegations in Wooster's second amended and supplemental complaint as true, Wooster owns approximately 4,535 acres of real property in Calaveras County, consisting of the Ranch Mine and the Stackpole (jointly, the property). In 1981, the prior owners of the property and the department executed and recorded a conservation easement deed and agreement (the deed) with respect to the property. The declarations in the deed specified that the owners and the department "desire[d] to preserve and protect [the property], for wildlife conservation purposes . . . and to prevent, in accordance with the terms contained [in the deed], said property from degradation of fish and wildlife habitat due to residential, industrial or other uses detrimental to such purposes." The declarations further specified that the owners would be able to continue using the land for grazing livestock, which was compatible with wildlife preservation, and would be able to develop the mineral rights on the property in the future.

Following these declarations, the deed granted to the department "full development and hunting rights in the form of a conservation easement over the . . . property subject to [certain] conditions" thereafter set forth. Five paragraphs then described rights retained by the owners. The sixth and seventh paragraphs described rights to access and to make improvements that were granted to the department. The eighth paragraph clarified that the department's access rights did not include "the right of access for the general

public over any portion of the . . . property." The ninth paragraph then specified that the department "shall post the property at all points of entry to inform the public that said property is a State wildlife area and that no trespassing or hunting is allowed."[1] The 10th paragraph made clear that the department was under no obligation to make any improvements or repairs or perform any maintenance "other than signing as noted in Clause 9 of this agreement." Finally, the 11th paragraph dealt with indemnity.

The department did not keep the property posted as required by the deed. In the absence of the required signs, people trespassed on the Ranch Mine, and it appeared that a marijuana growing operation was set up there.

In May 2009, Wooster acquired the Ranch Mine portion of the property. In January 2010, Wooster commenced this action against the department by filing a complaint to quiet title, for rescission and cancellation, and for declaratory relief. Wooster sought to rescind the deed because the department did not comply with the posting requirement. Wooster also claimed the department was "not authorized to accept a grant of 'full hunting rights' " and such a grant was "inconsistent with the purposes of a conservation easement."

The department demurred. The trial court sustained the demurrer with leave to amend as to the cause of action for rescission and cancellation of the deed on the ground there were "insufficient allegations of fraud or undue influence to support [such] a cause of action."

The parties subsequently agreed Wooster could file a supplemental complaint alleging that Wooster had, since the filing of the original complaint, acquired the Stackpole portion of the property. Thereafter, in June 2010, Wooster filed a first amended and supplemental complaint. Again, the department demurred. This time, the trial court sustained the demurrer as to all causes of action with leave to amend.

In October 2010, Wooster filed his second amended and supplemental complaint. The department demurred again. The department also filed a motion to strike each of the causes of action in the complaint. This time, the trial court sustained the demurrer without leave to amend as to the first five causes of action. On the cause of action for nonperformance of a condition, the trial court concluded Wooster had failed to allege sufficient facts to show that the posting requirement was a condition subsequent to requiring forfeiture of the department's interest in the property. On the illegal contract cause of action, the court concluded Wooster had failed to allege sufficient facts to demonstrate that the conveyance of full development and hunting rights to

---

[1] We will refer to this as the posting requirement.

the department was an illegal conveyance. On the two rescission causes of action, the trial court concluded Wooster had failed to sufficiently allege undue influence, fraud, or illegality in the creation of the conservation easement. Finally, the court concluded the quiet title cause of action failed because it was "solely dependent upon [Wooster] establishing the preceding four causes of action." As to the remaining cause of action for declaratory relief, the trial court ruled the action could proceed on that cause of action because a "request for a declaration as to the respective rights of the parties under the conservations easement is appropriate." The court also denied the motion to strike.

In February 2011, the department moved to strike the cause of action for declaratory relief on the ground that the only controversies alleged involved the same contentions asserted in the causes of action as to which the court had sustained the department's demurrer without leave to amend. Wooster opposed the motion to strike but acknowledged that, depending on the basis for the court's ruling as to the illegal contract cause of action, the motion might be well taken. Noting that the time for a motion for reconsideration had passed, the trial court denied the motion to strike.

In April 2011, the department tried again, filing a motion for reconsideration or, in the alternative, a renewed motion to strike. This time, in an attempt to clarify its original ruling overruling the demurrer on the declaratory relief cause of action, the trial court granted the motion to strike that cause of action in part, striking certain portions of the cause of action so that all that remained was the allegation that "[a] judicial determination and declaration is appropriate and necessary in order that the parties may ascertain their respective rights and duties with respect to the Property."

Recognizing that the trial court's ruling had gutted the sole remaining cause of action,[2] the department prepared a formal order that acknowledged that the court's ruling left "no remaining controversy alleged in the sixth cause of action . . . that would support the rendering of a declaratory judgment" and which provided that the declaratory relief cause of action was "stricken in its entirety." Wooster's attorney approved the order, and the court signed it.

Thereafter, in June 2011, the trial court entered a judgment of dismissal. Wooster timely appealed.

---

[2] Most significant was the fact that following the "partial" granting of the motion to strike, there no longer remained any allegation in the declaratory relief cause of action that there was an actual controversy between the parties, which is a necessity for such a cause of action. (See Code Civ. Proc., § 1060 [providing that an action for declaratory relief may be brought "in cases of actual controversy relating to the legal rights and duties of the respective parties"].)

## DISCUSSION

### I

### Conservation Easements

■ "Conservation easements are negative easements that impose specific restrictions on the use of the property" they cover. (*Johnston v. Sonoma County Agricultural Preservation & Open Space Dist.* (2002) 100 Cal.App.4th 973, 976 [123 Cal.Rptr.2d 226].) By statute, a conservation easement is "any limitation in a deed, will, or other instrument in the form of an easement, restriction, covenant, or condition, which is or has been executed by or on behalf of the owner of the land subject to such easement and is binding upon successive owners of such land, and the purpose of which is to retain land predominantly in its natural, scenic, historical, agricultural, forested, or open-space condition." (Civ. Code, § 815.1.) "A conservation easement is an interest in real property voluntarily created and freely transferable in whole or in part for the purposes stated in Section 815.1 by any lawful method for the transfer of interests in real property in this state." (*Id.*, § 815.2, subd. (a).) "A conservation easement shall be perpetual in duration" (*id.*, subd. (b)) and "shall not be deemed personal in nature and shall constitute an interest in real property notwithstanding the fact that it may be negative in character" (*id.*, subd. (c)). "The particular characteristics of a conservation easement shall be those granted or specified in the instrument creating or transferring the easement." (*Id.*, subd. (d).)

A state agency may acquire a conservation easement "if otherwise authorized to acquire and hold title to real property and if the conservation easement is voluntarily conveyed." (Civ. Code, § 815.3, subd. (b).)

### II

### Condition Subsequent or Covenant

On appeal, Wooster contends that, contrary to the trial court's ruling, the posting requirement was a condition subsequent to the granting of the conservation easement, such that the department's failure to comply with that requirement resulted in the department's forfeiture of the easement. We disagree.

■ "A condition subsequent is one referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party, if he chooses to avail himself of the condition." (Civ. Code, § 1438.)

With respect to interests in real estate in particular, "[c]onditions subsequent are those which in terms operate upon an estate conveyed and render it liable to be defeated for breach of the conditions. Such conditions are not favored in law because they tend to destroy estates, and no provision in a deed relied on to create a condition subsequent will be so interpreted if the language of the provision will bear any other reasonable construction. While no precise form of words is necessary to create a condition subsequent, still it must be created by express terms or by clear implication." (*Hawley v. Kafitz* (1905) 148 Cal. 393, 394 [83 P. 248]; see Civ. Code, § 1442 ["A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created."].)

■ Like other interests in real property, "[a]n easement may be conveyed subject to conditions subsequent and extinguished if they occur." (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 260 [52 Cal.Rptr.2d 82, 914 P.2d 160] (conc. & dis. opn. of Mosk, J.).) Here, the deed granting the conservation easement to the department provided, as one of many "conditions," that the department was to post the property with no trespassing and no hunting signs. The question is whether this provision was intended to operate as a condition subsequent, such that the department's failure to comply with the posting requirement would result in the extinguishment of the conservation easement, or instead was intended to operate only as a covenant, the breach of which could give rise to a cause of action for breach of contract but would not result in extinguishment of the easement.

■ Referring to the passage in *Hawley*, quoted above, Wooster argues as a threshold matter that the rule of strict construction against conditions subsequent does not apply here because "the reason for [that rule] is that [such] conditions 'tend to destroy estates,' " and here "[a]ll defendants will lose is an easement," which " 'is not an estate in land.' " We are not persuaded. The rule against construing language in a deed as a condition subsequent is merely a specific application of the more general rule that "[t]he law abhors forfeitures." (*Lamont v. Ball* (1949) 93 Cal.App.2d 291, 294 [209 P.2d 9].) It does not matter that what would be forfeited here would be a conservation easement, rather than an "estate." As our Supreme Court said long ago, it is "the settled policy of the law not to enforce a forfeiture in the absence of a clear statement to that effect." (*Universal Sales Corp. v. Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771 [128 P.2d 665].) That rule applies no matter *what* is subject to the alleged forfeiture.

Turning to the substantive issue, Wooster asserts the posting requirement was intended as a condition subsequent because the deed specifically included the requirement in the list of "conditions" to which the easement was subject. For at least two reasons, however, that argument is not persuasive.

██ First, the mere use of the word "condition" does not necessarily connote a condition subsequent. (See *Gramer v. City of Sacramento* (1935) 2 Cal.2d 432, 438–439 [41 P.2d 543].) As we have noted, the deed of the conservation easement here included 11 paragraphs in its list of "conditions," but, as the department points out, "[m]ost of those clauses address rights reserved to the Grantors or conveyed to the grantee in addition to the development and hunting rights conveyed in the granting clause, and obviously are not intended to be conditions subsequent, the breach of which forfeits the easement." Just as in *Gramer*, here "[i]t cannot be seriously contended that the reservation[s] . . . sought to be expressed [in these other clauses] w[ere] such by virtue of the use of the word 'condition' as to create a condition subsequent." (*Gramer*, at p. 439.) In other words, it makes little sense to interpret the posting requirement as a condition subsequent just because it appears in a list of "conditions," when the other terms that also appear in that list cannot be reasonably interpreted as conditions subsequent. Thus, California Supreme Court precedent significantly undercuts Wooster's position that, without exception, "a grant 'subject to' certain conditions is a grant subject to a condition subsequent."

Second, the cases on which Wooster relies do not support his contention that language in a deed making a grant "subject to" a specific "condition" necessarily creates a condition subsequent. For example, Wooster cites *Firth v. Marovich* (1911) 160 Cal. 257 [116 P. 729] in support of this proposition, but in *Firth* the deed also specifically provided, following the conditional language, " '[t]hat any breach of the foregoing conditions, or any of them, occurring after the delivery of this deed, shall have the effect of forfeiting the title of the grantee and his assigns, and thereupon the title to said real property shall revert to the grantor.' " (*Id.* at p. 258.) In other words, the deed in *Firth* specifically provided for forfeiture of title upon failure of the condition. There was no similar language in the deed here.

Wooster contends that "express language of forfeiture or reversion" is not necessary to create a condition subsequent. While that may well be true, for the posting requirement here to be reasonably construed as a condition subsequent rather than simply a covenant, there would have to be something more than the inclusion of that requirement in a list of "conditions," most of which consist of reserved rights that can in no way be construed as establishing conditions subsequent. Wooster, however, does not (and cannot) point to any other language in the deed supporting his construction of the posting requirement as a condition subsequent.

Wooster contends that "[t]he law provides that a condition subsequent is created in situations, such as here, where damages from breach are difficult or impossible to establish." In support of this argument, he cites *Downing v.*

*Rademacher* (1901) 133 Cal. 220 [65 P. 385], which involved the conveyance of a mine in exchange for "one third of the gross proceeds obtained by working the mine." (*Id.* at pp. 224–225.) We find *Downing* of little use because we do not understand that case to involve the determination of whether particular language in a deed creates a condition subsequent. In any event, even if the principle Wooster purports to derive from *Downing* was correct, it does not govern here, because damages for the department's (alleged) breach of the posting requirement *are* ascertainable. Specifically, Wooster could prove his damages by proving how much it would cost to "post the property at all points of entry to inform the public that said property is a State wildlife area and that no trespassing or hunting is allowed." That is the value of the performance Wooster was denied when the department failed to post the property as required.

To the extent Wooster posits that it would be difficult or impossible to prove *consequential* damages from the department's breach—that is, damages from trespasses that may have occurred because the department did not satisfy the posting requirement—that problem does not support construing the posting requirement as a condition subsequent. First, it is unclear to what extent Wooster would even be entitled to claim such damages, because he could have mitigated any harm flowing from the department's alleged breach by himself posting the signs the department was supposed to have put up. (See *Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691 [32 Cal.Rptr.2d 329] ["The doctrine of mitigation of damages holds that '[a] plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided.' "].) Second, even assuming he might be entitled to some consequential damages that would be difficult to determine, Wooster identifies no authority supporting his contention that the difficulty in proving consequential damages supports construing language in a deed as a condition subsequent. In other words, Wooster points to no case that supports construing the language in the deed as a condition subsequent because Wooster might find it difficult or impossible to prove that the department's failure to put up the required signs was a cause of one or more trespasses that damaged his property.

In summary, we reject Wooster's argument that the posting requirement constituted a condition subsequent. The trial court correctly concluded that the requirement is merely a covenant, and no forfeiture of the conservation easement resulted from the department's alleged breach of that covenant.

### III

*Rescission for Breach of the Posting Requirement*

Wooster contends his complaint stated a valid cause of action for rescission based on the department's breach of the posting requirement. We disagree.

■ "It is settled that a deed without fraud in its inception conveys the title, and is not void for any failure of consideration, either in whole or in part. [Citation.] Acts done subsequent to the execution and delivery of a deed cannot affect its integrity, and a subsequent failure of consideration or breach of a personal covenant not amounting to a condition, will not avoid the deed, if there was no fraud or false representation." (*Lavely v. Nonemaker* (1931) 212 Cal. 380, 383 [298 P. 976].) "To hold that a vendor of real property could, for a failure to pay the purchase money or other consideration, repudiate his deed and recover the land, would render real estate titles dangerously uncertain, and would result in the most serious consequences." (*Id.* at p. 385.)

Echoing his argument about the rule of strict construction against conditions subsequent (discussed above), Wooster contends the foregoing rule "does not apply here" because the reason for the rule is to avoid rendering real estate titles " 'dangerously uncertain,' " and here "[t]here is no issue about uncertainty of real estate titles" because "[t]he covenant . . . is in the deed itself, and, obviously, may be discovered by a title search."

Wooster's attempt to distinguish this case from cases like *Lavely* is without merit. It is true that in *Lavely* the breached promises upon which the plaintiff based his action to set aside the deed he had given his daughter were *oral* promises (see *Lavely v. Nonemaker, supra,* 212 Cal. at pp. 381–382), while the promise at issue here appears in the recorded deed. The rule the court applied in *Lavely* did not turn on the oral nature of the promise, however. In other words, the law does not provide that a deed cannot be rescinded based on the breach of an oral promise, but *can* be rescinded based on the breach of a written promise contained in a recorded deed. Instead, the law is that "a deed without fraud in its inception . . . is not void for *any* failure of consideration . . . ," period. (*Id.* at p. 383, italics added.) This is so because the uncertainty the rule seeks to avoid is not uncertainty regarding whether a deed was based on a promise, but rather uncertainty regarding whether the consideration for a deed was, in fact, conveyed as promised. Such uncertainty would exist here as much as in any other case, because in no case can someone tell from a mere title search whether a particular covenant for which the conveyance was given has or has not been fulfilled. Here, for example, one could not determine from searching the title to the Ranch Mine and the

Stackpole whether the department had fulfilled its obligation to post no hunting and no trespassing signs on the property. Thus, allowing the breach of that promise to serve as a basis for rescission of the easement would render the conservation easement as "dangerously uncertain" as any other interest in real property subject to rescission for failure of consideration.

In short, the conservation easement here was not subject to rescission based on failure of consideration.

### IV

### *Legality of the Grant of Hunting Rights*

Wooster contends that to the extent the deed granted the hunting rights on the property to the department so that the department could prevent those rights from being exercised by anyone, the grant was "illegal, and unenforceable." According to Wooster, such a grant "offends the statutory regulatory framework, as well as the policies of the law to provide for hunting opportunities" and "takes the Agreement outside the legitimization of the conservation easement statutes." Taking each of Wooster's arguments in turn, we reject them all.

### A

### *Public Policy*

Wooster first argues that the grant of hunting rights to the department, which amounts to a permanent ban on hunting, violates the policy of the state, which is to maintain hunting opportunities and control them by regulation. We are not persuaded.

Citing a variety of provisions from the Fish and Game Code, Wooster attempts to extract from those provisions, via selective quotations, a "public policy to control the taking of game through duly promulgated regulations." In his view, a permanent ban on hunting "through a deed or contract" is contrary to that policy and therefore illegal.

To refute Wooster's argument, we need only point to a few provisions that he has ignored. For example, take Fish and Game Code section 1801. Wooster emphasizes that one of the objectives expressed in that statute is "[t]o provide for the beneficial use . . . of wildlife by all citizens of the state." (Fish & G. Code, § 1801, subd. (b).) He further notes that another of the objectives expressed in the statute is "[t]o maintain diversified recreational

uses of wildlife, including the sport of hunting." (*Id.*, subd. (e).) Focusing on these provisions in isolation, Wooster tries to cobble together a public policy in favor of hunting that, in his view, is contravened by the hunting ban that resulted from the conservation easement here.

█ Read in its entirety, however, Fish and Game Code section 1801 supports, rather than forbids, the creation of areas where wildlife can be safe from depredation by hunters. For example, the opening paragraph of the statute provides that "[i]t is hereby declared to be the policy of the state to encourage the preservation, conservation, and maintenance of wildlife resources under the jurisdiction and influence of the state." (Fish & G. Code, § 1801.) Indeed, all of the objectives thereafter set forth in the statute are but parts of this overarching policy. Certainly, creating pockets of land where wildlife cannot be legally hunted assists in "the preservation, conservation, and maintenance of wildlife resources" and thus in no way can be considered contrary to the public policy expressed in section 1801.

As another example, Fish and Game Code section 314 provides that the Fish and Game Commission "at any time may close to the taking of any species or subspecies of bird or mammal . . . any area where, in the judgment of the commission, added protection for birds or mammals is needed to properly conserve the birds or mammals, for such time as the commission may designate." By accepting a grant of the hunting rights on the property at issue here, so as to prevent anyone from exercising those rights in perpetuity, the department essentially has done nothing more than exercise the power granted by Fish and Game Code section 314. Again, this shows how the department's action of accepting the conservation easement at issue here was consistent with, not contrary to, the public policy underlying the Fish and Game Code.

█ We need not consider this argument further. Suffice it to say that in no way does the Fish and Game Code establish a public policy that forbids the department from accepting a conservation easement for the purpose of creating an area, comparable to a game refuge, in which no hunting is allowed.[3]

B

*Board Acquisition of Property*

Wooster next argues that a grant of hunting rights to the department is contrary to the purposes for which the department can acquire property under

---

[3] To the extent Wooster suggests in passing that the Legislature's power to create game refuges (see Fish & G. Code, §§ 10500, 10820–10843) is exclusive, he cites no authority for that proposition, and we therefore reject it.

the Wildlife Conservation Law of 1947 (Fish & G. Code, § 1300 et seq.) (the 1947 law). Again, we disagree.

The 1947 law begins by noting that "[t]he preservation, protection and restoration of wildlife within the State is an inseparable part of providing adequate recreation for our people in the interest of public welfare . . . ." (Fish & G. Code, § 1301.) Thereafter, the 1947 law repeatedly refers to both preservation and recreation as interrelated. (E.g., Fish & G. Code, §§ 1345, 1347.) From this, Wooster draws the inference that the department could not accept a grant of hunting rights in order to prevent hunting because doing so "destroy[s] the main recreational use of the property."

Wooster's reading of the 1947 law is too narrow, however. While the law does inextricably tie preservation to recreation, it does not do so in a way that precludes the department from acquiring land or, as here, an easement, for the purpose of preventing all hunting on that land. For example, Fish and Game Code section 1346 expressly provides that the Wildlife Conservation Board "shall . . . ascertain what lands are suitable for providing cover for the propagation and rearing in a wild state of waterfowl, shore birds, and upland birds, and the possibilities of acquiring easements on such lands to provide such cover." This provision authorizes just the sort of action the department took here in acquiring the hunting rights to what became Wooster's property—acquiring property rights to provide wildlife a "safe harbor" in which to propagate.

What Wooster's argument ignores is the self-evident fact that creating pockets of land in which wildlife can be safe from hunting actually does serve to increase the recreational use of wildlife, including as objects of the sport of hunting. This is so because wildlife populations that can increase in the protected areas will inevitably move to unprotected areas where they can be hunted. In this manner, wildlife is preserved, protected, and restored, while at the same time the opportunities for the recreational use of that wildlife are increased.

For the foregoing reasons, there is no inconsistency between the 1947 law and the department's acceptance of a grant of hunting rights.

### C

### *The Civil Code*

Wooster next contends that a grant of hunting rights to the department is void under certain provisions of the Civil Code involving the ownership of property. Again, Wooster is wrong.

Civil Code section 669 provides that "[a]ll property has an owner, whether that owner is the State, and the property public, or the owner an individual, and the property private." Civil Code section 656 provides that "[a]nimals wild by nature are the subjects of ownership, while living, only when on the land of the person claiming them, or when tamed, or taken and held in possession, or disabled and immediately pursued." Wooster contends the grant of hunting rights to the department amounts to the "extinguishment or perpetual abatement of the right to own animals on th[e] land" involved here, which "surely cannot be done under these Civil Code provisions."

 This argument has no merit. An agreed-upon ban on hunting does not extinguish, destroy, or perpetually abate anyone's right of ownership. Under Civil Code section 656, Wooster can still claim ownership of the wild animals on his property. Under the terms of the conservation easement, however, neither he nor anyone else can lawfully hunt those animals.

Wooster contends that a hunting ban of the sort at issue here is "similar to a restrictive covenant" that "burdens, but does not benefit, the land," and such covenants "do not run with the land" "[u]nless they fall within Civil Code [section] 1468, which [this one] does not." In other words, he contends that because the hunting ban is not appurtenant to other property, the ban is unenforceable against him. He acknowledges that "restrictions falling within the conservation easement statutes are an exception" to this rule, but he contends the extinguishment of hunting rights has no place in a conservation easement. We turn to that issue.

D

*Consistency with the Conservation Easement Statutes*

 As we have previously noted, by statute the purpose of a conservation easement "is to retain land predominantly in its natural, scenic, historical, agricultural, forested, or open-space condition." (Civ. Code, § 815.1.) Wooster contends that "[p]reventing hunting does not retain land in a 'condition' " and therefore the conservation easement here was not valid. We disagree. The "natural" and "historical," not to mention "scenic," condition of land can easily be understood as land teeming with wildlife—as it was before the advent of men, women, and firearms. Using a conservation easement to ban hunting most certainly does help retain land in this sort of unspoiled condition. As such, a hunting ban is unquestionably a legitimate aspect and aim of a conservation easement.

## V

### *Rescission Based on Mistake*

Wooster contends his complaint stated a valid cause of action for rescission based on mistake because "the parties to the Agreement understood that the purported grant of hunting rights was legal and valid, but it was not, and the Agreement was [therefore] entered into through mistake." (Fn. omitted.) Our conclusion above that the grant of hunting rights was legal leaves this argument bereft of any support.

For all of the foregoing reasons, we find no error in the trial court's sustaining of the department's demurrer without leave to amend.

## DISPOSITION

The judgment is affirmed. The department shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Raye, P. J., and Hull, J., concurred.

A petition for a rehearing was denied December 17, 2012, and appellant's petition for review by the Supreme Court was denied February 13, 2013, S208032.